1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
        - - - - - - - - - - - - - X
 3
   UNITED STATES OF AMERICA,       : 23-cr-293(JMW)
 4                                 :
                                   :
 5                                 :
        -against-                  : United States Courthouse
 6                                 : Brooklyn, New York
                                   :
 7                                 :
                                   : August 21, 2023
 8   ADAM KAPLAN and DANIEL        : 3:00 p.m.
     KAPLAN,                       :
 9                                 :
             Defendants.           :
10
        - - - - - - - - - - - - - X
11
           TRANSCRIPT OF CRIMINAL CAUSE FOR ORAL ARGUMENT
12           BEFORE THE HONORABLE JAMES M. WICKS
                UNITED STATES MAGISTRATE JUDGE
13
```

14   A P P E A R A N C E S :

15   For the Defendant       MORRISON COHEN
     Adam Kaplan:                909 Third Avenue
16                              New York, New York 10022
                            BY:  ERIC CREIZMAN, ESQ.
17

18   For the Defendant       SHER TREMONTE LLP
     Daniel Kaplan:             41 Madison Avenue
19                              New York, New York 10010
                            BY:  MICHAEL TREMONTE, ESQ.
20                          BY:  BRACHAH GOYKADOSH, ESQ.

21

22   For Nonparty           CLEARY GOTTLIEB STEEN & HAMILTON, LLP
     Cadwalader, LLP:           One Liberty Plaza
                                New York, New York 10006-1470
23                          BY:  VICTOR HOU, ESQ.
                            BY:  DAVID HERRINGTON, ESQ.
24

25

Court Reporter:  MICHELE D. LUCCHESE, RPR
225 Cadman Plaza East / Brooklyn, NY 11201
MLuccheseEDNY@gmail.com
Proceedings recorded by mechanical stenography; transcript produced by Computer-Aided Transcription.

Proceedings                                                    2

1          THE COURTROOM DEPUTY:  All rise.

2          Criminal cause for oral argument, 23-cr-293, USA

3    versus Kaplan, et al.  Please state your appearances for the

4    record, starting with the nonparty.

5          MR. HOU:  Thank you.  On behalf of nonparty

6    Cadwalader Wickersham & Taft, LLP, Victor Hou, and my partner,

7    David Herrington, from Cleary Gottlieb Steen & Hamilton.  Good

8    afternoon, Your Honor.

9          THE COURT:  Okay.  Good afternoon to both of you.

10   Nobody has to rise.  You can remain seated and stay in your

11   seats.

12         Go ahead.

13         MR. TREMONTE:  Thank you, Your Honor.  Michael

14   Tremonte, Scher Tremonte, LLP for Daniel Kaplan, who is seated

15   to my left.  And with me in court today is my colleague,

16   Brachah Goykadosh, also representing Daniel Kaplan.

17         THE COURT:  Good afternoon all of you.

18         MR. CREIZMAN:  Good afternoon, Your Honor.  Eric

19   Creizman of Morrison Cohen on behalf of Adam Kaplan, who is to

20   my right.

21         THE COURT:  Good afternoon, Mr. Kaplan, and Mr.

22   Creizman.  Nice to see you, Mr. Creizman.  I think the last

23   time I didn't see you, I heard you.

24         MR. CREIZMAN:  Yes.

25         THE COURT:  Okay.  And I appreciate your

Proceedings                                                    3

1    flexibility.  I had to be in Brooklyn here today.  And,

2    frankly, I think all of you are from New York, so it's

3    probably easier for you to come here.  And Judge Cho was kind

4    of enough to let me use his courtroom.

5             Anyway, here we are.  So I like, for oral arguments

6    for me, it's a discussion.  And I mean that.  Let's have a

7    discussion over these issues.  These are serious issues that

8    are raised in the motion.  And I appreciate the papers that I

9    received on them, or Judge Azrack received on them.

10            And I just want to confirm, no reply was filed,

11   correct?

12            MR. TREMONTE:  That's correct, Your Honor.

13            THE COURT:  Okay.

14            MR. CREIZMAN:  That's right.

15            THE COURT:  Mr. Creizman, the same for you as well?

16            MR. CREIZMAN:  Yes.

17            THE COURT:  Not that it was required, to be clear.

18   But you were offered the opportunity.  I just want to confirm

19   that if it didn't come in, I had missed.

20            So let's start.  For the movants, who's going to

21   speak primarily?

22            MR. TREMONTE:  I will start today, Your Honor.

23            THE COURT:  Okay.

24            MR. TREMONTE:  I haven't submitted a letter on my

25   own and I felt that it was time that I spoke up.

Proceedings                                                    4

1        THE COURT:  I was waiting to hear from you.

2        Let me ask you then about jurisdiction over

3    Cadwalader.  How do we here have jurisdiction over nonparty

4    Cadwalader?  They were not counsel of record in the criminal

5    case.  Unlike some cases -- in fact, we'll talk about some of

6    the cases that were relied on, but how do I have

7    jurisdiction -- how does the Court have jurisdiction over

8    Cadwalader?

9        MR. TREMONTE:  Yes, Your Honor.  I think there are

10   two separate pathways.  Frankly, I think the straightest and

11   shortest --

12       THE COURT:  All Writs Act.

13       MR. TREMONTE:  Say again.

14       THE COURT:  All Writs Act.  Is that right?

15       MR. TREMONTE:  I was not going to say that,

16   actually.

17       I was going to point to Judge Mann's very thoughtful

18   decision in the *Kleinman* case in which she recommended to the

19   district court against the exercise of supplemental

20   jurisdiction.

21       The Court may remember that in that case there was a

22   request, a motion to the district court basically asking for

23   the district court to hear what amounted to a fee dispute --

24       THE COURT:  Right.

25       MR. TREMONTE:  -- involving former counsel.

Proceedings                                                          5

1            THE COURT:  Right.  Former counsel in that case.

2            MR. TREMONTE:  In that case.  Correct.

3            The Court was not sitting as -- presiding over a

4    criminal case.  It was a civil case.

5            THE COURT:  Right.

6            MR. TREMONTE:  Just as Judge Mann reasoned, she said

7    the issue of *Kleinman's* entitlement to Tonkin's case file --

8    and Tonkin was the litigant --

9            THE COURT:  Yes.

10            MR. TREMONTE:  -- does not rest on the Court's

11    exercise of supplemental jurisdiction.  In fact, Judge Mann

12    recommended against the exercise of supplemental jurisdiction

13    after going through the --

14            THE COURT:  But supplemental jurisdiction is a

15    concept of subject matter jurisdiction, not personal

16    jurisdiction.

17            MR. TREMONTE:  Correct.

18            Judge Mann went on to say, however -- and remember,

19    declined supplemental jurisdiction.  So said to the district

20    court I don't think it should be --

21            THE COURT:  So as to that claim, we're not going to

22    deal with it.

23            MR. TREMONTE:  We're not going to deal with it.

24            Quote, federal courts have always had the inherent

25    power to manage their own proceedings and to control the

Proceedings                                                    6

1    conduct of those who may appear before them -- citing cases --

2    the power to control the actions of attorneys as officers of

3    the court also extends to the right to require attorneys to

4    turn over their case files to their clients.

5              And so we are dealing with a court hearing about a

6    dispute involving a lawyer who was no longer appearing in the

7    case.

8              THE COURT:  But it wasn't that case.

9              MR. TREMONTE:  It wasn't that case.  That's correct.

10             Here, Your Honor, I think the argument for the

11   Court's exercise of its inherent power to manage its own

12   proceedings is much stronger for a number of reasons, even

13   putting aside the All Writs Act, which I'm not abandoning,

14   but --

15             THE COURT:  I do want to talk about that.

16             MR. TREMONTE:  I don't think we need to get there.

17             THE COURT:  Okay.

18             MR. TREMONTE:  Here, unlike any other reported

19   decision that I am aware of, we are before the criminal court,

20   and the criminal court, Your Honor and Judge Azrack, had an

21   obligation to ensure that my client's constitutional rights

22   are protected in this proceeding and those rights include the

23   right to counsel, under the Sixth Amendment, the right to

24   effective representation, and the right to a fair trial.

25             THE COURT:  And a speedy one.

Proceedings                                                    7

1      MR. TREMONTE:  And a speedy one.  So I think that if

2  you -- and that's a key point, Your Honor, which I'm happy to

3  develop later.

4      And I think if you put together Judge Mann's, I

5  think, very thoughtful observations about the inherent power

6  of the Court to supervise proceedings, Cadwalader is

7  unquestionably -- Mr. Blanche, all of the lawyers of the

8  Cadwalader firm, are all officers of this Court.  They were

9  previously -- and this is undisputed -- representing my client

10 and his brother.  If you pair that reasoning with this Court's

11 obligations to ensure that my client has a constitutionally

12 adequate trial, I think you get there.  I think the All Writs

13 Act gets you there as well for the reasons laid out in our

14 letters, but I don't think you need it.

15     THE COURT:  Okay.  So you're saying Cadwalader's

16 prior representation of your client -- I'm going to say

17 clients collectively, because it's the same argument, right?

18     Mr. Creizman, I assume you would make the same

19 argument.

20     MR. CREIZMAN:  Yes, Your Honor.  This is a joint --

21     THE COURT:  That's exactly what I thought.  I'm not

22 lumping you in for any reason other than the same argument --

23     MR. CREIZMAN:  Yes.

24     THE COURT:  -- I think you would have that's just

25 been advanced.

Proceedings                                                    8

1        So if that's the case, what you're saying is that

2   these prior representations, which I guess ultimately the same

3   conduct culminated into a criminal indictment, which is this

4   case, for that reason, there should be an exercise of the

5   inherent powers to direct -- to turn over the file?

6             MR. TREMONTE:  I think that's right.  And I think

7   we're in a different -- a slightly different posture when this

8   request was initially brought before the Court sitting over

9   the SEC --

10            THE COURT:  In the SEC case.

11            MR. TREMONTE:  -- case.

12            THE COURT:  All right.

13            MR. TREMONTE:  I think the constitutional dimension

14   was really not as pronounced nearly.  And in both *Pomerantz*

15   and *Teicher*, right, the two only cases we're aware of that --

16            THE COURT:  Right.

17            MR. TREMONTE:  -- in some ways the main battle

18   ground here.

19            THE COURT:  I agree.

20            MR. TREMONTE:  Those were cases -- I think in

21   *Teicher* you had post-conviction proceedings.

22            *Pomerantz,* like *Teicher* --

23            THE COURT:  *Teicher*, I think it was the Abramowitz

24   firm, I think.

25            MR. TREMONTE:  Yes, it was.

Proceedings                                      9

1        THE COURT:  So Abramowitz tried the case, lost, and

2   now it's on their motion to get out as counsel, right?

3        MR. TREMONTE:  I think and more.

4        THE COURT:  Well, yeah.

5        MR. HOU:  And a motion to compel the fees as well.

6        THE COURT:  Right.  It was to compel the fees as

7   well.

8        MR. TREMONTE:  Yeah.

9        THE COURT:  But it was on the law firm's motion in

10  that case to try to get out and get fees.

11       MR. TREMONTE:  Correct.

12       THE COURT:  Jurisdiction is not even a question, not

13  even an issue there.  And then the Court there did invoke the

14  All Writs Act, but in one sentence.  And the question there is

15  it ancillary to assist you in effectuating a court order-- an

16  existing court order or to prevent a violation of an existing

17  order.  And I think that's what the Court did there.

18       MR. TREMONTE:  I think that's right.  I found that

19  interesting that Judge Haight, I think it was --

20       THE COURT:  Yes, it was.

21       MR. TREMONTE:  -- sua sponte invoked the authority

22  of the All Writs Act.  I don't think that was briefed.  I

23  don't think any of the parties --

24       THE COURT:  Not that I was able to find.

25       MR. TREMONTE:  -- sought to have that applied.  And

1  I haven't seen it since.  I think the judge could equally have

2  gotten there the same way that Judge Mann did.

3        And that -- you know, the procedural posture of that

4  case is also a very significant difference.  As Mr. Hou points

5  out, the Morvillo firm was looking to recover its fees.

6        THE COURT:  Right.

7        MR. TREMONTE:  That's not the case here.  Here, it's

8  actually the other way around.  My client and his brother have

9  brought suit in State Court on what is essentially an

10  overbilling claim with a malpractice claim as well.

11        THE COURT:  You say essentially, but the wherefore

12  clause in that case, which I looked at, also seeks to compel

13  the turn over of the file, the precise relief that was sought

14  in the SEC action and denied and now here.

15        MR. TREMONTE:  What that Court does not have before

16  it on its lists of concerns are the same constitutional

17  considerations that this Court has at the very top of its

18  sheet.

19        THE COURT:  That may be so, but couldn't you have

20  sought or seek a provisional remedy?  There, there's an

21  urgency; my clients were just indicted.  That's the

22  irreparable harm.  We need those files now.

23        Why isn't that a remedy in Supreme Nassau?

24        MR. TREMONTE:  It doesn't make sense to bring these

25  constitutional arguments in front of a State Court judge.

1          THE COURT:  Why not?

2          MR. TREMONTE:  Because the State Court can ignore

3    them.  Judge Azrack has an obligation to ensure that the

4    proceedings before her are consistent with my client's rights

5    under the Sixth Amendment.  The State Court judge does not.

6              And beyond that, as I was saying before, we're sort

7    of in an upside down posture here with respect to the

8    retaining lien.  You don't often see a law firm let alone --

9    well, first of all, you never see a law firm, let alone a

10   leading law firm like Cadwalader, asserting a retaining lien

11   in an indicted criminal case, never.

12             But, second, you don't see a law firm, let alone a

13   leading law firm like Cadwalader, seeking to invoke a

14   retaining lien when it isn't seeking to get paid in any forum

15   for its overdue fees.

16             So, for all of these reasons really we thought --

17             THE COURT.  Listen, doesn't Cadwalader have

18   six years to sue for that?

19             MR. TREMONTE:  They do, and they could, but they

20   just answered in a case and didn't bring counterclaims.

21             MR. HOU:  We didn't answer because we filed a motion

22   to dismiss.

23             THE COURT:  Yes.  I thought they moved to dismiss.

24             MR. TREMONTE:  I'm sorry.  I apologize.

25             So for the reasons that I've just articulated, in

Proceedings                                                          12

 1  our view the appropriate forum, for getting the maximum

 2  attention to what we feel are ultimately the key issues,

 3  namely, the constitutional right to counsel issues, that's why

 4  we brought it here.

 5          THE COURT:  Okay.  *Pomerantz* -- the two cases really

 6  that you articulated that really are sort of the source of the

 7  battle here are the *Teicher* case, which we talked about, and

 8  then *Pomerantz*.  Now, *Pomerantz*, it's a civil case, not a

 9  criminal case, but it does articulate the concept of the need

10  in criminal cases for files.

11          MR. TREMONTE:  Yes.

12          THE COURT:  Doesn't *Pomerantz*, though, require a

13  showing on your part of a particularized need for this file,

14  not just an assertion of a general or urgent need for the

15  file, that you have to particularize that need, according to

16  *Pomerantz*?  And that's just one aspect of it.

17          The second aspect under *Pomerantz* -- and, again, I

18  would like your take on it -- is that *Pomerantz* requires a

19  showing of prejudice without it, that if it's not granted

20  here, there's prejudice.  And the third is the financial, that

21  is, the client's inability to either pay some or all of the

22  fee or post security.  And here, I didn't see any of those

23  showings articulated here other than in a general sense.

24          And on top of that, I would like to hear from you in

25  terms of Cadwalader's offer that if you post a bond, we will

Proceedings                                          13

1    give you the file.

2              MR. TREMONTE:  So let me take those in turn, Your

3    Honor.

4              THE COURT:  Of course.

5              MR. TREMONTE:  First of all, I think that the key to

6    understanding the relevance of *Pomerantz* here is the Court's

7    observation that, quote, there is no evidence, other than the

8    ipse dixit of KC&R -- this is the law firm at issue -- that

9    the papers are urgently needed to defend against a criminal

10   prosecution of the defendants, at the time of argument, no

11   indictment or information had been filed, and we have not been

12   advised of any change in the situation since then.  So right

13   off the bat you've got a key distinguishing characteristic.

14             THE COURT:  No indictment.

15             MR. TREMONTE:  Not an indicted case.  Nor are we

16   before the judge who's going to be presiding over the criminal

17   case who has an affirmative obligation to ensure that the

18   constitutional rights of the defendants are met.

19             THE COURT:  Yes.

20             MR. TREMONTE:  Even if -- and that really just

21   changes the playing field entirely.

22             But, here, I think that speaks directly to the first

23   prong need, right.  In that case, you just had ipse dixit.

24   That's the holding.  That's all there was.

25             THE COURT:  Right.

Proceedings                                              14

1          MR. TREMONTE:  Here, Your Honor is sitting as the

2   judge in the indicted criminal case.

3          THE COURT:  Right.

4          MR. TREMONTE:  If we were required to demonstrate

5   need beyond that, which I think could never be squared with

6   the constitutional consideration --

7          THE COURT:  Except the language in *Pomerantz* goes on

8   to say only upon the clients making a clear showing, a clear

9   showing of the need for the papers, the prejudice that would

10  result from denying him access to them, and his inability to

11  pay the legal fees or post a reasonable bond.  I guess it's

12  the clear showing.

13         MR. TREMONTE:  Right.  And that, again, Your Honor,

14  is a non-indicted case.

15         THE COURT:  Do you think the standard would be

16  different in a non-indicted case or just that it would be met

17  more easily in an indicted case?

18         MR. TREMONTE:  It has to be different, and I'll talk

19  about the other prongs.  It has to be different.

20         There's no way to evaluate the sufficiency of the

21  safeguards of my client's constitutional rights and apply the

22  same criteria that were applied in the unindicted case, first

23  with respect to need, right.  I mean, we have an indicted

24  case.  That should be enough.

25         With respect to prejudice, that should also be

Proceedings                                                    15

1   clear, right.  And that's clear if you think about --

2            THE COURT:  You say that.  Again, that's a very

3   conclusory statement the way you say it.  If you've got the

4   files, maybe they were never copied to your client and

5   therefore they don't have any documents.  Maybe they've got

6   duplicates.  Maybe they've got documents that are not -- like,

7   I don't know.

8            MR. TREMONTE:  Here, I would take the position that

9   ipse dixit is enough after you have had an indictment.  But

10  even if that's not enough, as we said in our letters, there

11  are five different categories of items in the file.  Let me

12  take the most -- I think they all meet the need requirement

13  if, in fact, the Court sees fit to impose that requirement,

14  and they all illustrate prejudice.  But take the most acute.

15           THE COURT:  Okay.

16           MR. TREMONTE:  The file contains Cadwalader's notes

17  and memoranda to file of interviews with potential witnesses

18  and other third-parties.  Now, just think about this in the

19  context of an indicted criminal case where you're talking

20  about what the Government has to turn over.  There's no

21  question that witness statements must be turned over to the

22  defense.  I think it's fair to assume, although I haven't seen

23  Mr. Blanche's notes, it's fair to assume that his notes or his

24  associate's notes reflect statements made by individuals who

25  are likely to be called to testify.  Okay.  Those statements

Proceedings                                          16

1    are absolutely critical to the preparation of the defense, not

2    least of all because -- I don't know how to say this.  It's

3    like on information and belief.  My general understanding,

4    without invading privilege, is that individuals who are

5    interviewed by Mr. Blanche made exculpatory statements to Mr.

6    Blanche.  If there are exculpatory statements or statements

7    that are consistent with my client's innocence contained in

8    the notes of the lawyer who put them in that file, we are

9    going to be severely prejudiced if we don't have them.  And,

10   boy, we need them.

11            THE COURT:  Okay.  But how can you compel them?

12   That's the question.  You've served a Rule 45 subpoena.

13            MR. TREMONTE:  But we're no longer in a Rule 45

14   subpoena.  I mean, that's in the SEC case.

15            THE COURT:  I agree.  You haven't served a Rule 17.

16            MR. TREMONTE:  Correct.  And that won't work because

17   a Rule 17 subpoena, of course --

18            THE COURT:  I didn't think it would work.  So you're

19   really talking a Rule 45.  That doesn't apply here.  You've

20   done that.

21            Why couldn't you go back to the SEC case or why

22   didn't you go back to the SEC case either for reargument, gee,

23   we've now served the subpoena and we think you were wrong on

24   the abstention, or again seek provisional remedy in Nassau

25   Supreme for a TRO?  There is an urgency here.  We've now been

Proceedings                                    17

1   indicted.  We need that file now.  We will post another

2   security.

3            MR. TREMONTE:  Your Honor, it all ties back to the

4   right to counsel and the right to effective assistance and a

5   fair trial.

6            THE COURT:  But are those available remedies?

7            MR. TREMONTE:  A 17(c) subpoena won't get you there,

8   least of all because you have to identify --

9            THE COURT:  I agree with you.  I'm glad you said

10  that because I was going to ask you.

11           MR. TREMONTE:  The Rule 45 subpoena I think is too

12  narrow for similar -- it's not -- the standard is not

13  identical, but we need the whole file.  We need for current

14  counsel to stand in the shoes of Mr. Blanche and make

15  effective constitutionally appropriate decisions about what is

16  relevant, what is not, what is useful, what is not, what is

17  exculpatory, what is good for impeachment purposes, what leads

18  to follow for further investigation, the whole range of

19  careful decisions that effective criminal defense counsel must

20  make.  Right.  You can't do that with the whole file.  You

21  can't get that on 45.  You can't get that on 17(c).

22           THE COURT:  No.

23           MR. TREMONTE:  That's not going to happen.

24           THE COURT:  So how about the inability to pay prong

25  and to post security?  You're saying it doesn't even matter

1  anymore because of the indictment, that trumps this whole

2  analysis, *Pomerantz*, you don't even apply?

3          MR. TREMONTE:  And if it didn't -- I am saying that,

4  but if I'm wrong about it, I mean, think about the

5  consequences.  Mr. Daniel Kaplan, my client, enjoys a Fifth

6  Amendment right not to incriminate himself.

7          THE COURT:  Of course.

8          MR. TREMONTE:  In order to post a bond, he's going

9  to have to go to a bond company, Pearson's down the block, and

10 he's going to have to provide information that will serve as

11 the basis for obtaining that bond.

12         THE COURT:  Didn't he have to do that for pretrial

13 release?

14         MR. TREMONTE:  No, he did not.  He did not have to,

15 and, in fact, did not provide any information, at my

16 instruction, to Pretrial Services about his financial

17 condition.  And the bond was posted based on only his parents'

18 finances.

19         THE COURT:  Okay.

20         MR. TREMONTE:  It's not just this case.  Right.  The

21 reason why this financial posting a bond prong is not going to

22 apply in the indicted case where the argument is in front of

23 the district court that's presiding over the criminal case is

24 because it, again, gives rise to hopeless constitutional

25 problems.  You just can't do it.

```
                            Proceedings                        19
```

 1            THE COURT:  All right.  Anything else on the defense

 2    side?

 3            MR. CREIZMAN:  No, Your Honor.

 4            THE COURT:  Well put by your colleague.

 5            MR. CREIZMAN:  Very well put.

 6            THE COURT:  It was very well put.

 7            Okay.  Mr. Hou, *Pomerantz*, does the three-part

 8    standard still apply once there is an indictment?

 9            MR. HOU:  Absolutely, because *Pomerantz* itself

10    assumes arguendo that in that case the clients, the former

11    clients had established a particularized need and assumed for

12    purposes of making the decision that it did that --

13            THE COURT:  Wasn't that pre-indictment?

14            MR. HOU:  It was pre-indictment, and there is no

15    record.  And obviously the electronic records are not

16    available for that case, so I couldn't trace it.  But the

17    Court assumed, said I'm going to -- that panel assumed.  Even

18    assuming there was a particularized need, meaning there was an

19    indictment, criminal charges, still you need to satisfy these

20    three elements.  And Your Honor has pointed out exactly the

21    reason why.  I don't think in the letter or the failure to

22    file a reply there's any detail whatsoever meeting the

23    standard set forth in *Pomerantz* in any of the three categories

24    that are required.  And it's reversible error if they don't

25    meet it.

Proceedings                                            20

1          The fact that there is an indicted case, that this

2     is not a situation of ipse dixit because there are, in fact,

3     charges here, I think is irrelevant because the constitutional

4     concerns here are really a problem of the defendants own

5     making.

6          Now, why do I say that?

7          I say that because unlike in all the other cases

8     that Your Honor has already pointed out, we're not before the

9     Court, we didn't ask to be substituted.  We have not been --

10    Cadwalader -- I internalize my client --

11         THE COURT:  I get it.

12         MR. HOU:  We have not been, and Cadwalader has not

13    been criminal counsel for nine months.  And, in fact -- or

14    regulatory counsel.

15         THE COURT:  But Cadwalader was counsel leading right

16    up --

17         MR. HOU:  Correct.

18         THE COURT:  -- to the SEC civil case and now this

19    indictment.

20         MR. HOU:  The civil case, is my recollection, was

21    filed by the SEC in March.  So at least four months had

22    passed.  So, in fact, I think the constitutional implication

23    is can't be that Cadwalader -- and the irony is not lost on us

24    that on the one hand the Kaplans are complaining about how

25    terrible the Cadwalader firm had represented them for years

Proceedings                                                    21

1    and are not entitled to anything.  Even though they

2    represented these two individuals for a year and three months,

3    through multiple litigations, through multiple investigations,

4    they say they aren't deserving of anything, but that yet all

5    the work they did is somehow essential to their defense.

6              They've had nine months with three separate law

7    firms.  In fact, four until recently.  Three separate law

8    firms have been representing the Kaplans.  There has been no

9    showing whatsoever that that able counsel on the other side of

10   the table can't competently defend them such that he would

11   deprive the defendants, the Kaplans, of having a fair trial

12   and effective counsel.  That's where, I think, there's simply

13   a, you know, mismatch of the facts --

14             THE COURT:  Let me ask you this:  What about witness

15   statements?  You've conducted interviews.  You -- again, I'm

16   internal.  You've conducted interviews.  You've got interview

17   notes and witness statements, some of which could be

18   exculpatory, no?  How do you deal with that from a -- now

19   there have been indictments.  How do you deal with that from a

20   fair trial and right to counsel concepts?

21             MR. HOU:  I think a couple, Your Honor.  The second

22   reason why there's not a constitutional issue, and it's really

23   one of their own creation, is, one, they do have effective

24   counsel.  They have two very able and experienced criminal

25   regulatory lawyers representing them at the table over there.

Proceedings                                                    22

1    That's number one.

2              THE COURT:  That doesn't answer --

3              MR. HOU:  Number two --

4              THE COURT:  I agree with you, but that doesn't

5    answer the question.

6              MR. HOU:  And they had the opportunity for months

7    before the charges were filed to investigate and to look into

8    and speak to their former clients.  They know who they are.

9    They know who they were talked to.  They could have easily

10   replicated that work.  There's no evidence that they didn't do

11   that, or they tried and then failed.  Okay.

12             The second is all they have to do is post a

13   security.  All they have to do is post a bond.

14             And I hear Mr. Tremonte say well, that would require

15   them to make statements to a bonds person.  Then, fine, we'll

16   take security from the parents who we know have means.  And

17   Your Honor signed the bond, a $2.5 million bond for each of

18   the defendants.  So $5 million secured by two pieces of

19   property.  They are redacted in the court record.  So they

20   have means.  So, number one, the parents could easily post the

21   security we're talking about.  And what we're talking about?

22   $760,000.  That's the amount.  That's the minimum amount.  It

23   could be more.  We would accept $760,000 bond.  Full stop.

24             The fact is that there also are other ways to skin

25   that cat. If they're uncomfortable with the bond, we can reach

Proceedings                                               23

```
 1   an escrow agreement.  We looked into that.  We suggested that.
 2   We understand the defendants are battling for their liberty.
 3   We also know that there's no court date set in neither the
 4   securities case brought by the SEC or by the Eastern District
 5   of New York DOJ indictment.  There is no trial date set.
 6   There's no imminent threat.  So we're nowhere near Teicher
 7   where was there was post-trial motions or other cases --
 8   excuse me -- Teicher, that was post trial, as was Pomerantz.
 9   So I think -- or pretrial.  So in my view, there is just no
10   constitutional dimension to the complaint and the obstacles
11   that they have thrown in their own way.  They have filed a
12   State Court case before all of this.  Now, five months or so
13   after the representation --
14            THE COURT:  And that was part of your argument
15   before Judge Lindsay?
16            MR. HOU:  Yes.
17            THE COURT:  In the SEC case that you got a State
18   court order already dealing with it.
19            MR. HOU:  Correct.  And --
20            THE COURT:  Wait a second.  Aren't you now moving to
21   dismiss that case?
22            MR. HOU:  We are moving to dismiss.
23            THE COURT:  If you are successful, doesn't that
24   eliminate one of their avenues?
25            MR. HOU:  What Your Honor is exactly right.  Can't
```

Proceedings                                    24

1    you seek a provisional remedy from the New York State Court,

2    the court that's going to be deciding all these issues.  And

3    Judge Lindsay, just to be clear --

4              THE COURT:  Hold on a second.  Slow down a minute.

5              Because if they do that, in your case for motion to

6    dismiss, one of the three elements that she or he, whoever the

7    State Court assigned judge is -- I don't think we've had one

8    assigned yet.  I'm looking at you.  It's not only irreparable

9    harm; it's the likelihood of success.  So they're going to

10   move for an injunction to turn over fees.  And one of the

11   branches is they would have to show the likelihood of success,

12   your motion to dismiss is, there is no success here.  So what

13   remedy do they have in the State Court really in the face of

14   your motion to dismiss?

15             MR. HOU:  Well, we can also invoke, at least try to

16   invoke, the supervisory authority of the court.  In that case,

17   we are a party.  We are there.  And, of course, we reserve the

18   right, as we did when we moved to dismiss.  And if any aspect

19   of that case survives, we will launch counterclaims and the

20   like.  We obviously have not answered it.  What we did was

21   respond with a motion to dismiss.

22             THE COURT:  Right.

23             MR. HOU:  Number two, we are a party in that case.

24   The Court would have supervisory authority and the State

25   Courts have -- and certainly can balance issues of

Proceedings                                                    25

1    constitutional dimension.

2           What is happening here is that the Kaplans are

3    trying an end run rather than posting security.  They have

4    literally filed multiple case, first in State Court, and then

5    they rush to the SEC court to try to have a motion to compel,

6    and then they filed the all writs application here.  And one

7    of the factors to get this extraordinary relief under the All

8    Writs Act is that they lack adequate remedies of the law.  And

9    Your Honor was getting at this precisely.  They have the State

10   Court action that they brought.  They brought it.  So they

11   have that opportunity to appeal to that court and say, hey, we

12   need this file.  But what the Court will say to them is, you

13   know, there is very well-developed case law in the State Court

14   system as well that says you should post a security.  There is

15   nothing stopping them from doing so.  They have means.  This

16   is not a case where --

17          THE COURT:  Except for what was articulated now:

18   Now that we're indicted, we're not so keen on revealing

19   assets.

20          MR. HOU:  Well, the fact of the matter is they also

21   have, as I mentioned before, the parents.  And the parents

22   have already posted security.  What we're talking about is a

23   bond or escrow of $760,000.  If they had a sworn affidavit, if

24   they had taken Your Honor up and decided to demonstrate

25   particularized need, as *Pomerantz* requires, and I know Mr.

Proceedings                                                26

1    Tremonte said five categories.  I counted four.  But
2    regardless, their letter did nowhere met that standard.
3    Number two, there was no articulation whatsoever as to why
4    they're unable to either agree to an escrow account -- we have
5    a neutral third-party.  We don't care where the money comes,
6    from as long as it is posted.  You know, again, there is no --
7    I don't think there is --

8            THE COURT:  I think Mr. Tremonte's argument, if I
9    heard him correctly, is that an indictment is a game changing,
10   it's different, and therefore, *Pomerantz*, you can look at it,
11   but it doesn't really apply here or it shouldn't apply, I
12   think.

13           Am I right, Mr. Tremonte?

14           MR. TREMONTE:  That's right, because post-indictment
15   Judge Azrack has obligations that didn't exist before.

16           THE COURT:  That's his argument.

17           MR. HOU:  I understand that argument, but I think
18   the Second Circuit particularly addressed that by saying
19   assume, look, I'm going to assume, we're going to assume, that
20   panel assumed that there was a particularized need, and they
21   said what that particularized need would be:  A criminal
22   indictment.  They assumed for purposes of this argument.  And
23   here, we don't have that.  What we have is ipse dixit.  We got
24   indicted, so we want it.

25           And the fact of the matter is, again, they're going

Proceedings                                                    27

1   to get a lot of this material.  There's a couple of arguments

2   I have on this:  Number one, staleness.  So obviously we've

3   been out of it for nine months.  Number two, they've had an

4   opportunity to investigate.  There is no argument here

5   anywhere in the record that these able counsels on the other

6   side of the table -- and there is, in fact, three, until

7   recently four, law firms representing the Kaplans -- couldn't

8   conduct their own independent investigation.  Three, the idea

9   that they're not going to have other ways of getting this

10  information is just not true.

11       As Your Honor knows, in this case and the criminal

12  case, of which Cadwalader is a nonparty, the Government has

13  *Brady* obligations that the Court has already affirmed.  If

14  there are statements that they took of witnesses that gave any

15  exculpatory information, the U.S. Attorney's Office is

16  obligated to turn that information over to the defense.  So to

17  the extent there's anything exculpatory that the Government

18  has and they talked to all these witnesses, they are over 50

19  different victims --

20       THE COURT:  They will be turned over by the

21  Government, you're saying.

22       MR. HOU:  Correct.

23       THE COURT:  Let me ask you this --

24       MR. HOU:  Second -- I'm sorry, Your Honor.

25       THE COURT:  Please.  Go ahead.  I didn't mean to

Proceedings                                    28

1    interrupt you.

2          MR. HOU:  Of the four categories, one of the

3    categories was the information that was produced voluntarily

4    by Cadwalader, for example, to the U.S. Attorney's Office.

5    That too will come in Rule 16 discovery under the criminal

6    rules of procedure.  So they are going to get that as well.

7          In addition, nothing stopped them from talking to --

8    they know who their alleged victims, former clients are.  And,

9    in fact, they been sued in civil court by certain of them.

10   They may seek discovery in those cases.  They may seek

11   discovery, as they've done, with respect to third-parties, by

12   launching subpoenas at different banks, their former

13   employers, IHT, among other.  And they've obviously served

14   Cadwalader with subpoenas.  And we'll respond in due course.

15   So they do have other remedies available to them and other

16   avenues where they will be able to get that information.

17         Not to mention, another category of the four was

18   presentations made to the SEC and DOJ.  Again, I would

19   respectfully argue that that is a moot point because the

20   charges have now been filed both by the SEC and DOJ.  This

21   isn't a situation where before there is a charging decision it

22   might be helpful to have that in order to try to dissuade the

23   prosecutors or the civil regulators from charging the clients

24   here.  The charging instruments, unlike many when I was a

25   former prosecutor in the district across the river, there is a

1    lot of specificity in these Complaints.  There are 16 counts

2    in the criminal indictment alone and it alleges all of the

3    different schemes and identifies specific wires and identifies

4    victims by number.

5            The SEC also has very detailed allegations, 40, 50

6    paragraphs of very detailed allegations, each of those would

7    have equipped the defendants former clients -- to be able to

8    pinpoint who those folks are and to try to develop information

9    about them.  So it is very clear that the Government in both

10   cases, both the SEC, which is the civil case -- they will be

11   entitled to civil discovery.  So before we hear about any

12   limitations on Rule 16 discovery in the criminal context,

13   they're going to get civil discovery in the SEC case.  But in

14   the criminal case as well, they have talked -- the Government

15   has talked to those victims.  The Government will be obligated

16   to turn over evidence.

17           THE COURT:  That I agree with.  But what about the

18   timing of all of this?

19           Discovery in an SEC action, discovery in the Nassau

20   Supreme action, if that survives, that's certainly not going

21   to fit deeply within the speedy trial clock, would it?

22           MR. HOU:  We don't know because we don't know -- so

23   far the parties, the defendants have waived the right to a

24   speedy trial until the first appearance, which is later this

25   month.

Proceedings                                    30

1        THE COURT:  But that's not waived forever.  They

2   could come --

3        MR. HOU:  I don't know.

4        THE COURT:  -- in at the next appearance and say

5   we're ready.

6        MR. HOU:  They could.  Obviously they can't create

7   the crisis by saying we want a trial immediately but we're not

8   prepared.  Right.  So obviously they're not going to cause

9   that.

10       THE COURT:  Or the Government could oppose a further

11  speedy trial.

12       MR. HOU:  But they would have to turn over their

13  evidence --

14       THE COURT:  Right.

15       MR. HOU:  -- and witness statements early.  The

16  Government would turn it over and, therefore, again,

17  minimizing prejudice.

18       THE COURT:  That's just the exculpatory, the *Brady*

19  material.  There are different categories here.  What they're

20  looking for here, some of which I agree what would include and

21  should be produced under *Brady*.

22       MR. HOU:  I'm trying to be cautious here because of

23  the attorney-client privilege.  But obviously to defend

24  itself, Cadwalader will defend itself against the scurrilous

25  allegations made by the Kaplans, their former clients.  But

Proceedings                                                    31

1   I'm going to try and be careful here.  One should not assume

2   there would just be, if there is any, exculpatory information.

3   One would also have to assume the opposite is true as well.

4   So putting that aside --

5           THE COURT:  So you've got a mix of stuff.

6           MR. HOU:  I'm just suggesting it can't be the facts

7   and circumstances of anything like this where there are so

8   many victims that have now alleged that they have been

9   defrauded, the chances are, yes, there may be information

10  that's helpful; there may be information that's not helpful.

11  But in any event, if I look at what the Government is

12  obligated to do, the most important evidence, the impeachment

13  evidence, all of that stuff, usually -- when I was a

14  prosecutor, now as a defense lawyer -- I don't get that until

15  a few weeks before trial.  We don't have a trial, you know, a

16  date scheduled in either of the cases.  So the idea of

17  prejudice will not be able to be overcome by great lawyering,

18  by independent investigation by counseled lawyers, I find hard

19  to believe.

20          THE COURT:  Let me ask you this:  How long did

21  Cadwalader represent these defendants in connection with the

22  investigation, interviews and whatnot?  Was it years?

23          MR. HOU:  It was a year and three months.  But I

24  won't say all of it is necessarily --

25          THE COURT:  So as good as you got across the table

Proceedings                                              32

1    from you -- and they are all good lawyers, we all know that --

2    the clock is running in some respects, isn't it?

3         Do they have as much time as Cadwalader did when

4    they were no actions in place?

5         MR. HOU:  So, again, I don't know when the trial is

6    going to be scheduled for a complex white-collar case, again,

7    involving -- I don't know how many documents the Government

8    intends to produce.  It could be years.  But in any event,

9    that year and three months that Cadwalader was working with

10   the Kaplans wasn't solely on the SEC and DOJ investigation.

11        THE COURT:  I have no doubt.  But there was also no

12   pressing civil action in place.  There was no criminal

13   indictment.

14        MR. HOU:  There was arbitration that the Kaplans

15   wanted to sue their former employers at IHT.  So a lot of

16   attention was devoted to that.  So it wasn't all focused on

17   the charges that are here.  And, obviously, now it's

18   different.  You have a target, as I said, and that goes back

19   to the detail, the very rich detail that's inside the charging

20   instruments.  Now the defense lawyers have a target to shoot

21   at, as opposed to before there were perhaps an investigation,

22   you don't know where it's going to go.  Now there's a direct

23   target for these counselors to focus their firearms to defend

24   their clients.  And they will have, and I trust that they will

25   have, argued for, before Your Honor or Judge Azrack, for more

Proceedings                                                            33

1   time if they need it, for whatever reason, to investigate.

2                MR. TREMONTE:  Your Honor --

3                MR. HOU:  In the meantime, of course, they could

4   post a bond or could agree to an escrow arrangement which

5   would not require Fifth Amendment rights issues being

6   implicated.  And certainly we would accept security from the

7   parents who we know to be of well to do.

8                THE COURT:  I'm sure you would.

9                MR. HOU:  So, again, that would not implicate any of

10  the concerns that are raise.

11               THE COURT:  It's a little bit different for a parent

12  to step up to preserve their sons' liberty as opposed to their

13  sons' fight for law firm fees.  Is there not a difference?

14               MR. HOU:  Well, again, without getting into

15  attorney-client privilege, the parents were intimately

16  involved in the representation of the.

17               THE COURT:  Were they clients?

18               MR. HOU:  No, they were not.  In fact, that was

19  something that -- again, that was the subject of discussion,

20  the fact that they were so involved.  But, again, I don't want

21  to go too much further into --

22               THE COURT:  I don't want you to.

23               MR. HOU:  To me, there's clear recourse here in the

24  State Court.  And as Your Honor has pointed out, they can get

25  that information if they believe that they're entitled to it

Proceedings                                              34

1   without posting security.  They are welcomed to address that

2   in State Court, not here, where they deliberately did not

3   contest Judge Lindsay's ruling back in July saying that they

4   needed a subpoena, Cadwalader first; and second, on *Colorado*

5   *River* abstention grounds.  They chose not to contest that

6   ruling and it became final after 14 days.  And even though

7   they say in their papers it was without prejudice, I looked at

8   the two-page order, I didn't see with prejudice anywhere

9   there.  It's with prejudice.

10          THE COURT:  Let me ask --

11          MR. HOU:  Especially since they chose not to contest

12   it and are seeking a third front to try to re-litigate that

13   issue that they waived.

14          THE COURT:  So if the defendants didn't bring the

15   Supreme Nassau action but instead went straight to Judge

16   Lindsay and the SEC, that eliminates the abstention argument,

17   right?

18          MR. HOU:  Correct.

19          THE COURT:  Or do you still think that it would be

20   some ground for abstention because they have a remedy in State

21   Court, they just haven't pursued it?

22          MR. HOU:  I certainly would have said that the

23   *Colorado River* abstention argument would have been a lot

24   weaker, if nonexistent.

25          THE COURT:  I agree.

Proceedings                              35

1        And then you're left with the subpoena, which

2   they've since now subpoenaed?

3        MR. HOU:  Correct.

4        THE COURT:  What if they withdrew the Nassau action?

5        MR. HOU:  Well, I'm not sure if that's on offer, but

6   obviously --

7        THE COURT:  I'm just positing.

8        MR. HOU:  We would not have --

9        THE COURT:  What does that do to the Judge Lindsay

10  application?

11       MR. HOU:  We would not have the abstention argument

12  and we wouldn't be making that argument in our response to the

13  objections to subpoena or if we would ever have to move to

14  squash the subpoena --

15       THE COURT:  What if, in oral argument again a motion

16  to dismiss is granted, the case goes away?

17       MR. HOU:  And if we still haven't reached some

18  resolution, which we have tried --

19       THE COURT:  Right.

20       MR. HOU:  -- which we have tried --

21       THE COURT:  Right.

22       MR. HOU:  -- then I think there would be arguments

23  to whether or not their need -- they didn't get it from

24  discovery.  We would see what they would get from discovery

25  either from the SEC and/or the DOJ in terms of *Brady*

Proceedings                                        36

1  disclosures or Rule 16 discovery.  And if they still didn't

2  have it, then I certainly -- we would have another argument

3  for Your Honor or Judge Azrack.

4             MR. TREMONTE:  Your Honor, can I address the

5  *Colorado River* abstention issue in particular?

6             THE COURT:  Yes.  I just want to make sure, Mr. Hou,

7  that you're completed.

8             MR. HOU:  Sure.

9             THE COURT:  For now.  I'm not saying you're done for

10 oral --

11            MR. HOU:  Of course, Your Honor.  Thank you.  I

12 appreciate it.

13            THE COURT:  Go ahead.  Go ahead, Mr. Tremonte.

14            MR. TREMONTE:  So the arguments that are adumbrated

15 in the papers, because I don't think that they have the

16 stomach to try make them in a full-throated way, essentially

17 turn *Colorado River* extension on its head.  There is no case

18 ever in which a district court judge presiding over a criminal

19 case has abstained under that doctrine --

20            THE COURT:  I will make it clear.  I don't think

21 *Colorado River* applies here.  It's irrelevant to me.  I agree

22 with you, I'll tell you that right now.

23            MR. TREMONTE:  Then I won't say another word about

24 it.

25            THE COURT:  I haven't seen any -- believe me, I've

Proceedings                                                    37

1    done a lot of research on it.  I haven't seen any cases in the

2    criminal context where they've applied *Colorado River*.

3            MR. TREMONTE:  And I would like to turn to the

4    staleness argument.

5            THE COURT:  Yes.

6            MR. TREMONTE:  Like Mr. Hou, although in this

7    district, I was a federal prosecutor, and we were fond of

8    saying --

9            THE COURT:  This side of the river.

10           MR. TREMONTE:  -- this side of the river -- as Mr.

11   Hou did, your clients know who they talked to.  That

12   absolutely does not apply in this case.  And the idea, the

13   suggestion that there's a staleness about the information in

14   the file is laughable.  Those interviews with potential

15   witnesses were conducted before the SEC Complaint was filed

16   and before the criminal indictment came down, and before

17   dozens of people had been visited by the FBI or called by SEC

18   investigators.  The perspective of those potential witnesses

19   before the Government stepped in and made perfectly clear its

20   perspective, wrong-headed, from this side of the table, is

21   going to be quite different from what they're going to say to

22   me now.  I do happen to think I'm a capable lawyer.  I'm not a

23   magician.  I can't make them forget all about the indictment

24   and the SEC action and the call that they got from the FBI.  I

25   can't do it.

Proceedings                                        38

1        So I think that rather than illustrating that we

2   don't have need, I think it very much illustrates the

3   opposite.  We need access to the notes that the lawyers took

4   when they were talking to witnesses before their minds were

5   tainted.  Okay.  And the only way we get that is from the

6   file.

7        By the way, the whole notion that the Government is

8   going to turn this stuff over as *Brady* and *Giglio* material,

9   that's only if they have it.  And I'm pretty confident, though

10  I don't know for sure, that Cadwalader is going to claim work

11  product and attorney-client privilege over most of these

12  documents and not want to turn them over to the U.S.

13  Attorney's Office, and with good reason.  I would do the same.

14       THE COURT:  Well, would you be entitled to the work

15  product notes, the internal memoranda of Cadwalader in any

16  event?

17       MR. TREMONTE:  We certainly would.

18       THE COURT:  Under what scenario?

19       MR. TREMONTE:  First of all, we cited the case law

20  that says that, but second of all, we need --

21       THE COURT:  What about the *Sage Realty* case in New

22  York?

23       MR. TREMONTE:  The *Sage Realty* case did not apply in

24  a situation like this one.

25       THE COURT:  I know.  But it did pronounce a rule

Proceedings                                          39

1   about what lawyers could keep in a scenario like this, did it

2   not?

3          MR. TREMONTE:  It did.  But there's no case that I

4   am aware of that applies that in a situation like this one --

5          THE COURT:  Either way.

6          MR. TREMONTE:  -- where the right to counsel is

7   implicated.

8          THE COURT:  I haven't seen one the other way either.

9          MR. TREMONTE:  That's true.  Your Honor, I think

10  there is a reason for that.

11         THE COURT:  Okay.

12         MR. TREMONTE:  This almost never happens.  Law

13  firms, especially really good ones, don't show up in court and

14  try to keep indicted criminal defendants whom they've formerly

15  represented from getting the file, right, for all sorts of

16  reasons:  For ethical reasons, for reasons of -- I don't know

17  -- maintaining their marketing visibility.  Like, there's lots

18  of good reasons, but it never happens.  And that's why I think

19  there's not a case on point.  But if, again, you weigh the

20  policies that were at issue in *Sage* against the policies that

21  Judge Azrack has to consider when she's ensuring that there's

22  a right to counsel and a fair trial, it's a layup.  Right.

23         So we need to be put in a position where we're

24  standing in the shoes of Mr. Blanche.  By the way, speaking of

25  thought experiments, here's the thought experiment that I

Proceedings                                              40

1    think is most apt:  Mr. Blanche and Cadwalader represented my

2    client at indictment for limited purposes, told the client

3    hey, I want another 2 million bucks or I'm not going to be

4    your trial counsel.  The client says I don't have 2 million

5    bucks.  Todd Blanche walks away.  There's no question that

6    Judge Azrack would require the file to be turned over to

7    successor counsel.  No question, even if there was an unpaid

8    bill, let alone in a situation like this one, where the

9    Kaplans have paid $1.6 million to Cadwalader for

10   representation over the course of ten months pre-indictment,

11   pre-SEC charge.

12           The notion that we are in a situation that's

13   analogous to any case where a lien which upheld, which has

14   never happened in a front of a federal criminal court, where

15   they've already paid 1.6 -- and by the way, Judge, I know this

16   is not the forum to get into the nitty-gritty, but Cadwalader

17   didn't render a single bill -- this is undisputed -- for

18   ten months.  Right.  They rendered the first bill, they paid

19   it, and they kept paying and kept getting new bills until they

20   were out 1.65.  That was October 2021.  By November 19th,

21   Cadwalader was out.  That's outrageous.  And it separates this

22   case from every other retaining lien case, especially where

23   Cadwalader is not seeking to recover its fees.

24           THE COURT:  Right.  But that's really an argument

25   for Supreme Nassau, no?

Proceedings                                              41

1          MR. TREMONTE:  Fair enough.

2          THE COURT:  Mr. Creizman.

3          MR. CREIZMAN:  If you don't mind.

4          THE COURT:  Of course.

5          MR. CREIZMAN:  Thanks.  I would like to add a couple

6    points.

7          THE COURT:  As well he did, you need to add more.

8          MR. CREIZMAN:  Yes.  I just need to get some things

9    off my chest, because I've never been a federal prosecutor on

10   either side of the river, but I was and I have always been a

11   defense lawyer, and as a defense lawyer, I don't like to -- I

12   would never leave ex --  the decision as to whether something

13   is helpful to my case in the hands of the prosecutors.  In

14   this case, I don't see how *Brady* could even apply to

15   Cadwalader's internal files.  Cadwalader, I don't believe, is

16   going to turn those memos to file over to the Government and I

17   don't believe the Government would necessarily turn all of

18   them over.

19         In addition, whether it's exculpatory or not, maybe

20   there are very inculpatory statements that some of their

21   clients made just theoretically --

22         THE COURT:  But do you think those internal memos

23   that Cadwalader had authored with their mental impression,

24   their analyses, that were not shared with the clients are fair

25   game for you now?

Proceedings                                    42

 1          MR. CREIZMAN:  I do.  And if Your Honor --

 2          THE COURT:  I haven't seen any cases -- and this is

 3   the *Sage Realty* issue we were alluding to -- where that has

 4   been directed.

 5          MR. CREIZMAN:  Well, Your Honor, there are two

 6   points on that.  First of all, I believe in one of the earlier

 7   filings -- and I don't have the filings in front of me, but

 8   there was an opinion by Judge Gardephe, which was cited and

 9   explained in some detail --

10          THE COURT:  The other side of the river.

11          MR. CREIZMAN:  The other side of the river, yes,

12   where Mr. Hou was.

13          So in that situation, Judge Gardephe first said

14   there was a desire to get memos to file, similar to here, and

15   Judge Gardephe -- the law firm brought up *Sage Realty*, they

16   raised the *Sage Realty* issue, and Judge Gardephe said, first

17   of all, *Sage Realty* doesn't apply in federal court.  When you

18   are talking about federal court, the federal law applying to

19   retaining liens is the -- is the appropriate law to look to.

20   But he says even under *Sage Realty*, where there's a dispute

21   between a client and a lawyer as to whether a memo to file is

22   helpful to that client, the client gets the benefit of the

23   doubt in those circumstances, and I think courts --

24          THE COURT:  The Judge Gardephe case, was that a

25   criminal case?

Proceedings                                        43

1          MR. CREIZMAN:  It was not a criminal case.

2          THE COURT:  Okay.  Do you have the cite on that?

3          MR. CREIZMAN:  I do.  If I had my -- if I had the

4    documents here.  I'm sorry.

5          THE COURT:  It's all right.

6          MR. CREIZMAN:  This was -- it was in one of the -- I

7    think a letter from Mr. Abrams, if I am not mistaken, early

8    on.  And I would love to find that case.

9          THE COURT:  That's okay.  I don't want to put you on

10   the spot, but --

11         MR. CREIZMAN:  No, no.  That's what I should be.

12         THE COURT:  That's okay.  I'm interested in the

13   case.  You can file a letter tonight or tomorrow.

14         MR. CREIZMAN:  I would like to do that, Your Honor.

15         THE COURT:  Yes, I would like you to do that.

16         MR. CREIZMAN:  I would like to address the *Sage*

17   *Realty* issue.

18         THE COURT:  And both parties have an opportunity as

19   well on the *Sage Realty.*  Cadwalader has, presumably, memos

20   that it has -- internal memos that it did not share with the

21   client.  Sharing with the client is another issue.  But if

22   they have not been shared with the client, does *Sage Realty*

23   apply here and say that those are off limits for the former

24   client in this context?

25         MR. HOU:  And, Your Honor, we would appreciate that

Proceedings                                                44

1  opportunity to review whatever the other side sends over.

2           THE COURT:  It could be the end of the week.

3           MR. CREIZMAN:  I can do it tonight.

4           MR. HOU:  If I may just very briefly, Your Honor, in

5  conclusion.  We appreciate, and I certainly appreciate your

6  latitude in letting me argue and make different points.

7           THE COURT:  Listen, this is why I wanted all of you

8  in.  You're all good lawyers.  The papers were good.  I want

9  to hear from you.  And I appreciate the discussion.  I mean

10 that.

11          MR. HOU:  So, number one, there's not one rule for

12 civil attorneys and then one rule -- a separate rule that

13 doesn't apply to criminal lawyers.  *Pomerantz* doesn't make

14 that distinction.  It assumes the worst-case scenario in that

15 instance in order to make the point, assuming arguendo, that

16 they prove that they need these documents.

17          I think as Your Honor has put it forward, there are

18 three distinct elements that they have to meet and they

19 haven't met it.  They haven't met the particularized need.  It

20 sounds like they're going to have more opportunity to try to

21 take another bite at it.  But what *Pomerantz* says, and Your

22 Honor has already picked up on it, it's not a free floating

23 you know, roam through Cadwalader's files in order to seek

24 what might be interesting.  There is a particularized need and

25 they failed to do that.  Second, we've already argued

Proceedings                                    45

1   prejudice.  I won't get into that.  The third, regardless,

2   they still haven't shown that they are indigent.  They still

3   have not shown --

4            THE COURT:  I get that.  But they're saying we

5   really don't have to at this point because the indictment

6   changes the whole analysis.

7            MR. HOU:  *Pomerantz* assumed an indictment, so

8   therefore --

9            THE COURT:  You're saying it doesn't.

10            MR. HOU:  -- it is reversible error.  It is

11   reversible error not to --

12            THE COURT:  Consider that factor?

13            MR. HOU:  Yes.

14            Second -- and we will address the *Sage Realty* point

15   when it becomes ripe --

16            THE COURT:  Yes.

17            MR. HOU:  -- but I just would say that obviously we

18   reserve and Cadwalader reserves the right to seek all of its

19   fees.  It did a lot of work in a number of different areas.

20   Its reputation has been besmirched by these defendants, not

21   the first law firm, school, former employer, client that

22   they've sued.  They're very litigious.  And we will defend

23   ourselves, as we have to.

24            And part of that defense involves, in the

25   malpractice instance, is causation.  So we will be able to,

Proceedings                                             46

1   and have to argue, and we will argue that, in fact, there was

2   no professional malpractice.  In fact, this was exceptional

3   lawyers doing exceptional work for clients that were in a

4   difficult situation of their own making, and we will break

5   that causation chain.  And one of the ways that we do that --

6   and I just want to make sure that everyone is clear, that we

7   are not waiving our right to do that.  We may have to waive

8   certain privileges in order to defend ourselves, and we will

9   do that if and when necessary.

10              THE COURT:  Mr. Tremonte, does not the Supreme

11  Nassau case create, in that issue, waiver?

12              MR. TREMONTE:  Your Honor, I'm not counseling or

13  representing any party on that matter.

14              THE COURT:  I'm just -- as we're talking about this,

15  if you bring a legal malpractice case in order to defend, that

16  does raise some issues of waiver, I think.  But, again, not

17  for me, not for this Court.  That's for Supreme Nassau, if it

18  survives.

19              MR. TREMONTE:  I think it's a Nassau County issue.

20              THE COURT:  Yes, I do too.

21              MR. TREMONTE:  But the one last issue that I wanted

22  to address, so it doesn't go unrebutted, is the issue about

23  the parents.  It, of course, is not appropriate for the Court

24  to consider the parents' resources in making a determination

25  here, but I will point out, since it's been raised, that

Proceedings                                                    47

 1  they've already put up what I'm guessing is a very substantial
 2  part of their net worth against the bond.  But the bottom line
 3  with respect to the parents is they're not before this Court,
 4  their resources cannot be considered in making this
 5  determination.
 6            THE COURT:  I appreciate that.
 7            Is it the *Gruss versus Zwirn* case?  Does that sound
 8  familiar?
 9            MR. CREIZMAN:  I think that's --
10            THE COURT:  My good law clerk, did you see him hand
11  me a note?
12            MR. CREIZMAN:  Yes.
13            THE COURT:  That was it.
14            MR. CREIZMAN:  That's the one.  *Gruss versus Zwirn.*
15  That was with Judge Gardephe.  And I'm not sure --
16            THE COURT:  That doesn't mean you can't still write
17  me a letter.
18            MR. CREIZMAN:  Yes.  Okay.  I will.
19            Just two points.  In terms of *Pomerantz,* after
20  *Pomerantz,* Judge Haight was certainly alerted, I'm sure, to
21  *Pomerantz.*  Now, that may be speculative.  But it did come
22  after the *Pomerantz* case.  And Judge Haight said no, this is a
23  criminal case, different -- the rules that we're talking
24  about, this doesn't apply.  I've never seen a criminal case.
25  I've looked all throughout history, and there was no criminal

Proceedings                                          48

1    case.

2           And he also cited a New York State case, People

3    versus -- I apologize.  I don't have the case in front of me.

4           MR. HOU:  Altvater.

5           THE COURT:  Altvater.

6           MR. CREIZMAN:  Very good.  Thank you.

7           That case, which also didn't require a posting of

8    any bond.

9           And putting aside really the underlying merits of

10   the dispute concerning the payment of the bills, it's clear

11   that the Kaplans did pay $1.65 million.  No one disputes that.

12   That may not mean that, you know, Cadwalader isn't right for

13   the extra 760.  I mean, the Kaplans may be entitled to money

14   back.  We don't know.

15          THE COURT:  That's not for this Court.

16          MR. CREIZMAN:  But if this were -- going back to Mr.

17   Tremonte's thought experiment, if Mr. Blanche and Cadwalader

18   were in the case and asked to withdraw from the criminal case

19   because they were paid $1.65 million but are owed $700,000,

20   it's not clear to me that the Court would let Mr. Blanche out

21   of the case or Cadwalader out of the case.  And I think that

22   that's an important --

23          THE COURT:  But they didn't represent your clients

24   in connection with the criminal case.

25          MR. CREIZMAN:  No.

Proceedings                                              49

1          THE COURT:  That's a difference with what Judge

2    Haight was facing.

3          MR. CREIZMAN:  Of course.

4          THE COURT:  And I think it's a difference that may

5    be significant or may not.  I would have to take a further

6    look at that.

7          MR. TREMONTE:  Although just so that -- I may have

8    misheard Your Honor.  I think unquestionably the Cadwalader

9    firm represented the Kaplan brothers in connection with the

10   criminal case to the extent that they interfaced extensively

11   with the United States Attorney's Office and prepared and

12   delivered a very extensive presentation.  And there was a lot

13   of careful decisionmaking that led up to that presentation,

14   which was exclusively through the lens of criminal defense.

15         THE COURT:  I didn't mean to suggest otherwise, if

16   my comments were construed that way.

17         But the *Teicher* case, you know, there, the Morvillo

18   firm represented through trial, lost the trial, and now Judge

19   Haight is saying okay, they want to take an appeal to the

20   Second Circuit and Morvillo's got the files.  That's the

21   scenario.  It's a little bit different than here, no?

22         MR. TREMONTE:  Yes.

23         THE COURT:  And let me ask Mr. Creizman, what if the

24   Nassau case is either dismissed voluntarily or by order of the

25   Court on their defendant's motion there, you've subpoenaed

Proceedings                                      50

1   Cadwalader through the SEC proceeding.  Is there any barrier

2   for you to seek the relief back before Judge Lindsay?

3            MR. CREIZMAN:  Well, I mean, I think that the

4   argument has much more -- is more compelling in the criminal

5   case, and I'm not sure that even the --

6            THE COURT:  Why?  Why is it more compelling here

7   then?

8            MR. CREIZMAN:  Well, I think that's what courts have

9   seem to find in the few cases that have addressed this.  But I

10  think it's more compelling because it's their liberty at stake

11  and because there was some significant investigation prior to

12  the criminal case being filed because there were numerous

13  discussions with prosecutors beforehand.  I think that's why

14  it's --

15           MR. TREMONTE:  And there's another --

16           THE COURT:  I got a question for you.

17           MR. TREMONTE:  Can I make this one quick point?

18  Promise, it'll be quick.

19           THE COURT:  Go ahead.

20           MR. TREMONTE:  This scenario illustrates sort of the

21  impermissible tension that they're going to bump into here.

22  So let's say we had made the decision -- let's say for some

23  reason the only avenue was in State Court to get this

24  information.

25           THE COURT:  Right.

Proceedings                                                  51

1        MR. TREMONTE:  I think we would be inclined to at

2   least considering moving for a stay in this court until such

3   time as we had the benefit of the file in the State Court,

4   which would necessarily come into direct conflict with our

5   constitutional right to a speedy trial.  You couldn't have

6   both.  And that's another reason why this really can't wait

7   for the State proceeding.  It's not the right place.  It's not

8   the job of the State Court to vindicate Daniel Kaplan's

9   constitutional rights in the criminal matter.

10        THE COURT:  Let me ask you -- again, picking up on

11  your thought experiment, I have a question for you.  Now, what

12  if Cadwalader, instead of representing your clients in the

13  investigation, the SEC investigation right up to a proffer

14  memo or something that sort of, you know, just before the

15  indictment came down, what if instead Cadwalader did contract

16  work for them, did all of the contracts that may be related to

17  their clients but wasn't the source of the SEC investigation

18  or the criminal case, any different result?

19        MR. TREMONTE:  With the caveat that I hadn't

20  actually entertained this thought experiment, I think it would

21  be a different case.  We don't want to step into the shoes of

22  contract attorneys.

23        THE COURT:  So might there be records that

24  Cadwalader has that you wouldn't be entitled to even under

25  your analysis if they've represented your clients in manifold

Proceedings                                          52

1    issues?

2         MR. TREMONTE:  I don't think so because it's my

3    understanding -- of course I didn't represent the Kaplans

4    while Mr. Blanche was representing them, but it's my

5    understanding that Mr. Blanche was engaged in 2021 for the

6    purpose of, principally, determining whether or not it was

7    true, as asserted by, I think a principal of IHT, that there

8    was a criminal investigation.  And in short order, Mr.

9    Blanche, as I understand it, learned from the prosecutors that

10   yes, in fact, that was the case.  So there is no good reason

11   to believe that any of the work that Cadwalader undertook on

12   behalf of the Kaplans was unrelated.

13        THE COURT:  So you can't really segregate work they

14   did?

15        MR. TREMONTE:  I think that's right.  And the

16   categories of materials that we identify in our letter --

17        THE COURT:  Which it is four, not five; right?

18        MR. TREMONTE:  Well, I break it down into five.

19        THE COURT:  You do?  I thought the letter said four.

20   That's what I have.

21        MR. TREMONTE:  The letter does list four.

22        THE COURT:  It must be a subgroup.

23        MR. TREMONTE:  I think it's important to distinguish

24   between the notes and memoranda to file of conversations and

25   presentations and interviews with third-parties and the

Proceedings                                                    53

1   documents that Cadwalader showed to them.  Right.  And

2   especially in this case where --

3            THE COURT:  Hold on a second.  Notes and memoranda

4   to file of conversations with presentations to, interviews of

5   those parties, and -- so category two really is 2-A and 2-B.

6            MR. TREMONTE:  I break them down into A and B

7   because it really illustrates just how this is core criminal

8   defense work that we're talking about.  And then this case

9   presents, in the next two categories, the unique problem of

10  Cadwalader's representation extended to producing documents to

11  both the SEC and the U.S. Attorney's Office and making

12  decisions about what to provide and what to withhold.  And I

13  think there has been some suggestion that our client should

14  themselves know how that worked and what was kept back, and

15  that's just not true.  We, I think, under the Constitution,

16  have the right to step into the shoes of Mr. Blanche and

17  understand how those decisions were made.

18           THE COURT:  Mr. Hou, I see you raised your hand.

19           MR. HOU:  I think I put my hand in my mouth.  I want

20  to be careful.  What Mr. Tremonte just said is not correct.

21  His clients had direct access to the database, review database

22  where they were able to and did access documents that could be

23  produced or if, in their opinion, could not be produced.  So,

24  in fact, they had direct visibility.  And, again, without

25  getting -- this was invited, it's a proper response --

Proceedings                                      54

1          MR. TREMONTE:  Well, no, I did not ask you to invade

2     the attorney-client privilege.

3          MR. HOU:  But you said it's incorrect --

4          MR. TREMONTE:  You can say it's incorrect.  We can

5     leave it at that.  I'm not going to fight you on that.

6          MR. HOU:  And I'll stop.

7          THE COURT:  I get your point on that.

8          MR. HOU:  I would just say again, Your Honor, there

9     has been no demonstration of a particularized need.

10         And *Altvater*, I believe it was a psychiatric report

11    that the defense lawyer had got or obtained on behalf of that

12    particular client that was at issue.  The file, the whole

13    trial, the transcript -- apparently they weren't able to get

14    expedited transcripts and filings of the exhibits, was the

15    subject of the *Teicher* case.  So, you know, this isn't what

16    they're asking for.  They're asking for everything, which is

17    exactly the relief that they are seeking in the State Court

18    case for a variety of reasons.  I know I've made that point.

19    I just wanted to be clear.

20         THE COURT:  I appreciate.

21         Anything further, Mr. Tremonte?

22         MR. TREMONTE:  Not from me, Your Honor.  Thank you.

23         THE COURT:  Mr. Creizman?

24         MR. CREIZMAN:  No, Your Honor.  Thank you.

25         THE COURT:  Mr. Hou?

Proceedings                                                    55

1          MR. HOU:  No.  Thank you, Your Honor.  Appreciate

2    it.

3          THE COURT:  I really appreciate your letters, the

4    arguments here today.

5          Why don't we say by the end of Friday?  If you want

6    to, and you don't have to, given our discussion and the things

7    that I was focusing on, if you want to supplement what you've

8    submitted, you can just do so by the end of the day Friday,

9    end of the day to me is midnight.  Just e-file it and we're

10   good to go.

11         Thank you very much everybody.

12         MR. HOU:  Thank you.

13         MR. TREMONTE:  Thank you.

14         (Matter concluded.)

15

16

17

18

19

20

21

22

23

24

25