**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

     v.

ADAM KAPLAN and DANIEL KAPLAN,

            Defendants.

Case No. 2:23-CR-00293 (JMA) (JMW)


# DANIEL KAPLAN'S OPPOSITION TO THE GOVERNMENT'S
# MOTIONS *IN LIMINE*

Michael Tremonte
Noam Biale
Alexandra Conlon
Claire Blumenthal Buck
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
Email: mtremonte@shertremonte.com

*Attorneys for Daniel Kaplan*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ............................................................................................................................ 1

I.  THE GOVERNMENT SHOULD NOT BE PERMITTED TO ADMIT
EVIDENCE CONCERNING THE SECURITIES AND EXCHANGE
COMMISSION LITIGATION AND CIVIL LAWSUITS AGAINST
DANIEL KAPLAN.......................................................................................... 1

II.  THE COURT SHOULD EXCLUDE EVIDENCE CONCERNING THE
LETTERS ISSUED IN CONNECTION WITH THE KAPLANS'
DEPARTURE FROM MERRILL LYNCH. ...................................................... 3

III.  THE COURT SHOULD EXCLUDE EVIDENCE CONCERNING THE
KAPLANS' ALLEGED STATEMENTS TO CLIENTS CONCERNING
THEIR EDUCATION AND SEPARATIONS FROM PRIOR
EMPLOYMENT. ............................................................................................. 4

IV.  THE GOVERNMENT SHOULD NOT BE ALLOWED TO ADMIT
EVIDENCE CONCERNING ADAM KAPLAN'S PARTICULAR BOND
CONDITIONS. ................................................................................................ 5

V.  THE COURT SHOULD PERMIT EVIDENCE OF THE KAPLANS'
INVESTMENT PERFORMANCE AND HONEST DEALING........................... 5

A.  Daniel Kaplan should be permitted to introduce evidence of
his honest dealing with alleged victims. ........................................ 6

B.  Daniel Kaplan should be permitted to introduce evidence
relating to his job performance. ..................................................... 8

VI.  THE COURT SHOULD REJECT THE GOVERNMENT'S MOTION
REGARDING THE DEFENSE'S IMPEACHMENT OF ITS WITNESSES........ 9

VII.  THE GOVERNMENT SHOULD NOT BE PERMITTED TO ELICIT
SUBJECTIVE TESTIMONY REGARDING MATERIALITY. ...........................11

VIII.  THE COURT SHOULD DENY THE GOVERNMENT'S MOTION TO
AUTHENTICATE AND ADMIT DOCUMENTS BECAUSE IT IS VAGUE,
OVERBROAD, AND IMPINGES UPON THE KAPLANS' ATTORNEY-
CLIENT PRIVILEGE WITH FORMER COUNSEL. ........................................ 15

i

A.    The government's motion to authenticate documents without witness testimony is vague and overbroad.................................... 15

B.    The government's motion to authenticate and admit documents "produced by the Kaplans" through testimony from their former criminal defense counsel impinges upon the Kaplans' Fifth Amendment rights and the attorney-client privilege. ................... 19

    1.    The proposed testimony introduces unnecessary Fifth Amendment concerns........................................................ 20

    2.    The proposed testimony would violate the Kaplans' attorney-client privilege. ................................................... 23

    3.    The proposed testimony would require the admission of prejudicial hearsay evidence concerning the SEC Action...................................................................... 25

    4.    The proposed testimony, even if properly limited, would be substantially more prejudicial than probative and should be excluded under Fed. R. Evid. 403. ................... 25

C.    The documents the government seeks to authenticate and admit may be protected by privilege............................................. 26

IX.    THE DEFENSE SHOULD NOT BE ORDERED TO PROVIDE DISCOVERY BEYOND ITS OBLIGATIONS UNDER THE FEDERAL RULES, WITH WHICH IT WILL COMPLY. ................................................... 27

CONCLUSION..................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Emspak v. United States*,
   349 U.S. 190 (1955) ............................................................................................. 22

*Fisher v. United States*,
   425 U.S. 391 (1976) ............................................................................................. 20

*In re Grand Jury Subpoena Dated Feb. 2,*
   *2012*, 741 F.3d 339 (2d Cir. 2013) ..................................................................... 19

*In re Grand Jury Subpoena Duces Tecum Dated May 9, 1990*,
   741 F. Supp. 1059 (S.D.N.Y. 1990) .................................................................... 20

*In re Katz*,
   623 F.2d 122 (2d Cir. 1980) ................................................................................ 21

*Penn. St. Univ. v. Vintage Brand, LLC*,
   755 F. Supp. 3d 563 (M.D. Pa. 2024) ................................................................. 18

*United States v. Aguilar*,
   No. 20-CR-390 (ENV), ECF No. 238 (E.D.N.Y. Jan. 2, 2024) ............................ 30

*United States v. Almonte*,
   956 F.2d 27 (2d Cir. 1992) .................................................................................. 10

*United States v. Ayers*,
   No. 20-CR-239 (BMC), 2024 WL 1158686 (E.D.N.Y. Mar. 18, 2024)................. 29

*United States v. Balboa*,
   12-CR-196 (PAC), 2013 WL 6196606 (S.D.N.Y. Nov. 27, 2013)......................... 5

*United States v. Damti*,
   109 F. App'x 454 (2d Cir. 2004) .................................................................. 5, 6, 7

*United States v. Daulton*,
   266 F. App'x 381 (6th Cir. 2008) ......................................................................... 7

*United States v. DeCicco*,
   435 F.2d 478 (2d Cir. 1970) .................................................................................. 4

*United States v. Gangi*,
   1 F. Supp. 2d 256 (S.D.N.Y. 1998) ..................................................................... 27

*United States v. Gelzer,*
    50 F.3d 1133 (2d Cir. 1995) ...................................................................... 2, 4

*United States v. Hubbell,*
    530 U.S. 27 (2000) ...................................................................................... 21

*United States v. James,*
    607 F. Supp. 3d 246 (E.D.N.Y. 2022) ......................................................... 7

*United States v. Johnson,*
    No. 20-CR-518 (JMA), 2025 WL 1181706 (E.D.N.Y. Apr. 23, 2025) ............. 28, 29

*United States v. Leonardi,*
    623 F.2d 746 (2d Cir. 1980) ......................................................................11

*United States v. Litvak,*
    808 F.3d 160 (2d Cir. 2015) ...................................................................... 13

*United States v. Litvak,*
    889 F.3d 56 (2d Cir. 2018) .................................................................... 13, 14

*United States v. M/Y Amadea,*
    770 F. Supp. 3d 558 (S.D.N.Y. 2025) ........................................................ 18

*United States v. Nekritin,*
    No. 10-CR-491 (KAM), 2011 WL 2462744 (E.D.N.Y. June 17, 2011) ......... 8

*United States v. Rosenwasser,*
    550 F.2d 806 (2d Cir. 1977) ........................................................................ 4

*United States v. Scarpa,*
    913 F.2d 993 (2d Cir. 1990) ........................................................................ 6

*United States v. Schwimmer,*
    892 F.2d 237 (2d Cir. 1989) ...................................................................... 24

*United States v. Smothers,*
    652 F. Supp. 3d 271 (E.D.N.Y. 2023) ........................................................ 30

*United States v. Williamson,*
    516 F.2d 390 (2d Cir. 1975) ...................................................................... 10

**Rules**

Fed. R. Evid. 403 ...................................................................................... 2, 4, 5

Fed. R. Evid. 404(b) ................................................................................... 3, 4

Fed. R. Evid. 613 ...................................................................................... 9, 10

Fed. R. Evid. 901(a) ............................................................................................ 23

Fed. R. Evid. 902(11) .................................................................................... 18, 19

**Other Authorities**

24 Fed. Prac. & Proc. Evid. § 5472 (1st ed.) ..................................................... 24

N.Y. Rule of Prof. Resp. 1.6 ............................................................................... 24

U.S. Dep't of Just., Just. Manual § 9-13.410 ..................................................... 25

## PRELIMINARY STATEMENT

The government's motions *in limine*, ECF No. 253 ("Mot."), make vague arguments premised on threadbare evidentiary proffers. The government asks the Court to admit broad categories of alleged prior bad act evidence at trial, without identifying the specific documents it would introduce or articulating any basis for the admission of such evidence against *Daniel Kaplan*. Likewise, the government seeks pretrial rulings deeming nearly sixty-thousand pages of exhibits authentic and admissible without making any effort to identify the documents at issue for the defense or the Court. Even as it makes these sweeping requests, the government asks the Court to curtail preemptively Daniel Kaplan's impeachment of government witnesses and impose novel discovery and disclosure obligations on him, without offering any reason to depart from the Federal Rules of Criminal Procedure and Evidence. The Court should deny the government's motions in full for the reasons set forth below. Daniel Kaplan joins Adam Kaplan's opposition to the government's motions *in limine* to the extent applicable to him.

## ARGUMENT

### I.     THE GOVERNMENT SHOULD NOT BE PERMITTED TO ADMIT EVIDENCE CONCERNING THE SECURITIES AND EXCHANGE COMMISSION LITIGATION AND CIVIL LAWSUITS AGAINST DANIEL KAPLAN.

The government seeks to admit evidence of the Securities and Exchange Commission ("SEC")'s civil enforcement action and of several lawsuits (together, the "Other Actions") at trial to (1) provide "relevant background to specific actions taken by Adam Kaplan and a co-conspirator in furtherance of crimes charged in the Superseding Indictment," and (2) counter anticipated impeachments of government witnesses concerning their lawsuits on cross-examination. Mot. at 2. Daniel Kaplan joins Adam Kaplan's arguments concerning the government's second proffered reason for admitting the Other Actions. As to the government's first proffered reason, in addition to joining Adam Kaplan's arguments, Daniel Kaplan makes

1

another:  The Other Actions should not be admitted against him because the government only alleges that it is necessary background evidence for actions allegedly taken by Adam Kaplan.

The government does not seek to admit the Other Actions against Daniel Kaplan, but he will be unfairly prejudiced by its admission against Adam Kaplan.  *See United States v. Gelzer*, 50 F.3d 1133, 1140 (2d Cir. 1995) ("Where allegedly prejudicial evidence is admitted solely against one defendant in a multi-defendant trial, the prejudice this might cause to his co-defendants is an appropriate consideration for Rule 403 balancing and may result in the exclusion of such evidence in the joint trial.").  Daniel Kaplan anticipated such spillover prejudice problems when he moved for severance,[1] and the instant motion demonstrates the challenges presented by trying Daniel and Adam together.  The government claims that the "SEC Action and the ███████ Lawsuit are highly probative and significant background evidence because their filings instigated certain criminal acts committed by Adam Kaplan that are charged in the Superseding Indictment," Mot. at 5, that "Adam Kaplan was determined to have the individual lawsuits dismissed" and engaged in criminal conduct to that end, *id.*, that "the SEC Action is also inextricably intertwined with evidence of the obstruction charges against Adam Kaplan," *id.* at 6, and that "the timing of the SEC Action and [Adam's] subsequent conduct is integral to the new charges brought in the Superseding Indictment," *id.* at 7.  But the government offers no reason the Other Actions should be admitted against Daniel, and there is none.

---

[1]    The government, notably, failed to alert the Court that it planned to introduce the Other Actions in opposing that motion—even though Daniel Kaplan raised exactly this potential problem.  *See* ECF No. 181 at 22.

If the Court permits the Other Actions as against Adam Kaplan, Daniel will be collateral damage because Daniel was named alongside Adam in all of the Other Actions.[2] Thus, even if the Court is not inclined to exclude the Other Actions evidence against Adam, it should still exclude it as to Daniel. The government should only be permitted to introduce such evidence for the limited purpose it identified—that is, to explain Adam's alleged subsequent conduct.

## II. THE COURT SHOULD EXCLUDE EVIDENCE CONCERNING THE LETTERS ISSUED IN CONNECTION WITH THE KAPLANS' DEPARTURE FROM MERRILL LYNCH.

The government seeks to admit evidence that after the Kaplans departed from Merrill Lynch ("ML"), Adam Kaplan acted in accordance with his "modus operandi" by submitting forged and fraudulent letters of support to contest their departure from ML (the "ML Letters"). *Id.* at 8–9. The Court should deny the government's motion for the reasons stated in Adam Kaplan's opposition and, moreover, should exclude the evidence as to Daniel Kaplan for the same reasons stated in Section I, *supra*.

While the government suggests it will introduce the ML Letters as to both Adam and Daniel, referring to them only in the collective, the particular evidence and justification proffered by the government pertains only to Adam. *Compare id.* at 8 ("the defendants asked victim witnesses to sign forms…"), *and* ("they reached out to victims to cover their tracks"), *with id.* at 9 ("Some victims will testify that the defendants asked them to write letters in support. *That is Adam Kaplan's modus operandi* and is exactly what *he* did in this case when *he* was trying to cover up his crimes." (emphasis added)). Without saying a word about Daniel, the government argues that evidence of the ML Letters is admissible "to show knowledge, intent, preparation, plan and absence of mistake" under Federal Rule of Evidence 404(b). The government proffers

---

[2]     As Adam Kaplan's opposition notes, the ███████ Arbitration did not pursue claims against either Adam or Daniel Kaplan.

no specific evidence of any alleged prior bad act by Daniel in connection with the ML Letters, nor any basis for admitting the ML Letters against Daniel under Rule 404(b).  Pursuant to Rule 404(b), evidence of a defendant's prior bad act is only admissible *against him* if the proponent demonstrates a permissible purpose as delineated in 404(b)(2).  The Court should exclude the ML Letters against Daniel because the government has failed to identify any permissible use of that evidence against him.  *See United States v. Rosenwasser*, 550 F.2d 806, 813–14 (2d Cir. 1977) ("'[P]rior similar acts of misconduct performed by one person cannot be used to infer guilty intent of another person who is not shown to be in any way involved in the prior misconduct, unless it be under a 'birds of a feather' theory of justice. Guilt, however, cannot be inferred merely by association.'" (quoting *United States v. DeCicco,* 435 F.2d 478, 483 (2d Cir. 1970)).  Further, the risk of spillover prejudice for Daniel warrants the ML Letters' exclusion under Rule 403.[3]  *See Gelzer*, 50 F.3d at 1140.

If the Court permits the government to introduce the ML Letters (and it should not for the reasons stated in Adam's opposition and herein), the government should only be permitted to present evidence needed to establish Adam Kaplan's alleged modus operandi (the only specific basis the government identified to admit the ML Letters evidence at all).

## III.    THE COURT SHOULD EXCLUDE EVIDENCE CONCERNING THE KAPLANS' ALLEGED STATEMENTS TO CLIENTS CONCERNING THEIR EDUCATION AND SEPARATIONS FROM PRIOR EMPLOYMENT.

For the reasons stated in Adam Kaplan's opposition, the Court should deny the government's motion to admit evidence concerning the Kaplan's alleged "dishonesty about their undergraduate educations and prior terminations."  Mot. at 10.

---

[3]    Here, too, the government failed to alert the Court during the litigation of Daniel Kaplan's severance motion that the government intended to introduce such prejudicial 404(b) evidence, and the ML Letters, as to Adam only.

4

## IV.    THE GOVERNMENT SHOULD NOT BE ALLOWED TO ADMIT EVIDENCE CONCERNING ADAM KAPLAN'S PARTICULAR BOND CONDITIONS.

The government does not suggest that it will seek to admit evidence of Daniel Kaplan's bond conditions at trial.  If that changes, Daniel reserves the right to oppose the admission of such evidence.  Additionally, Daniel Kaplan joins the arguments in Adam Kaplan's opposition and urges the Court to limit evidence of Adam's bond conditions not only to avoid unnecessary prejudice to Adam, but also to avoid undue spillover prejudice to Daniel, in violation of Rule 403, whose bond is the same.

## V.    THE COURT SHOULD PERMIT EVIDENCE OF THE KAPLANS' INVESTMENT PERFORMANCE AND HONEST DEALING.

The government seeks to preclude two categories of potentially exculpatory evidence. First, the government asks the Court to exclude evidence of specific instances in which Daniel Kaplan dealt honestly with the alleged victims if such specific instances are offered to "negate [Daniel's] intent to lie to victims on other occasions."  Mot. at 16.  Second, the government asks to exclude evidence concerning "the absence of financial loss or certain financial gains" to the alleged victims in connection with Daniel Kaplan's work as a financial advisor.  *Id.* at 18.

With respect to the government's first request, the government concedes that specific instances of prior good conduct may be admissible at trial for reasons other than propensity.  *See id.* at 17 (quoting *United States v. Damti*, 109 F. App'x 454, 456 (2d Cir. 2004), to acknowledge past good acts can be probative where the government alleges continuous bad acts); *see United States v. Balboa*, 12-CR-196 (PAC), 2013 WL 6196606, at *3 (S.D.N.Y. Nov. 27, 2013) (permitting the defense to present past good acts evidence to undermine defendant's alleged motive).  But, where the government alleges a yearslong scheme to defraud at least 160 people, and seeks to introduce mountains of alleged prior bad acts evidence, the Court should not preclude wholesale specific instances of prior good conduct.

5

### A.    Daniel Kaplan should be permitted to introduce evidence of his honest dealing with alleged victims.

As the government concedes, "[e]vidence of past 'good acts' by a defendant" can be probative where the government alleges the defendant has "'always' or continually committed 'bad acts,' or where the evidence of 'good acts' would undermine the underlying theory of a criminal prosecution."  Mot. at 17 (quoting *Damti*, 109 F. App'x at 456); *see also United States v. Scarpa*, 913 F.2d 993, 1010–11 (2d Cir. 1990) (accepting past good acts "would only relevant if the indictment charged them with ceaseless criminal conduct").  That is precisely what the government alleges here.

The government claims that through their investment advisory services, the Kaplans perpetuated a scheme to defraud at least 160 clients and through which they obtained millions of dollars.  *See* ECF No. 198 at 2–5.  The government alleges three fraud schemes as to Daniel Kaplan that cover every phase of his relationship with his clients.  First, the government claims Daniel and Adam induced clients to work with them at █ by promising to charge them one fee, and then, without authorization, charging them more.  *See* ECF No. 149 ¶¶ 16–18.  Second, the government claims that after Daniel Kaplan signed clients, he used his access to those clients' financial accounts to misappropriate their money without their knowledge.  *Id.* ¶¶ 19–22.  If a client detected the alleged theft, the government claims Daniel Kaplan then somehow lied to the client about it.  *Id.* ¶ 22.  Third, the government claims that after allegedly overbilling his clients and stealing from them by misappropriating their funds, he concealed his alleged wrongdoing by either presenting fraudulent documents to the clients' financial institutions to defeat the clients' fraud claims or paying the clients off to silence them (using other clients' stolen funds).  *Id.* ¶ 23.  Otherwise stated, the government claims that from beginning to end, from signing a client until the end of their relationship, Daniel Kaplan engaged in fraudulent conduct.

The government's broad allegations thus present the circumstances that the Second Circuit contemplated in *Damti* when it held that prior instances of good conduct may be admissible to rebut alleged continuous bad conduct. *See Damti*, 109 F. App'x at 456. Courts, moreover, have applied *Damti* in similar circumstances: In *United States v. James*, 607 F. Supp. 3d 246 (E.D.N.Y. 2022), for example, the defense sought to admit evidence concerning instances of the defendant's legitimate medical billing where the defendant was charged with medical billing fraud. *Id.* at 256–58. Citing *Damti*, the government argued that prior good acts evidence should be excluded where it intended to present only discrete, identified instances of fraud. *Id.* The government claimed it had identified a limited set of nine exemplar patients whose medical bills are "representative" of the defendant's particular fraudulent schemes. *Id.* But the court recognized that the government's "case-in-chief appear[ed] to be far more expansive than what was presented in *Damti*," that the government would not limit its evidence to the exemplar patients, that the government planned to argue the defendant caused thousands of fraudulent medical bills to issue for thousands of patients, and that the court was unaware of "even a single non-fraudulent claim billed by Defendant, or more broadly, a non-fraudulent area of Defendant's billing practice." *Id.* at 258. The court ruled the defense was not precluded from generally seeking to admit specific good acts evidence to rebut the government's broad accusation and reserved further decisions for trial. *Id. See also United States v. Daulton*, 266 F. App'x 381, 386 (6th Cir. 2008) (describing whether "defendant should have been permitted to present" prior good acts evidence in tax fraud case as a "close question" given defendant's argument that, though he was not charged with conspiracy, "the government tried his case like a conspiracy by using evidence not charged in the indictment").

Here, the government *has* plainly alleged "ceaseless, all-encompassing criminal conduct." *United States v. Nekritin*, No. 10-CR-491 (KAM), 2011 WL 2462744, at *5 (E.D.N.Y. June 17, 2011). The government cannot attempt to prop up its far-reaching fraud allegations through evidence of alleged prior bad acts, and then hide from the breadth of its allegations when the defense seeks to rebut them. *See, e.g.*, Mot. at 21 (acknowledging "numerous victims for whom the defendants opened brokerage accounts saw positive returns on those investments"). The Court should follow *James* and, rather than categorically excluding prior good acts evidence, evaluate such evidence as it arises and based on the government's presentation.

**B.    Daniel Kaplan should be permitted to introduce evidence relating to his job performance.**

While the defense does not dispute that actual economic loss is not an element of wire fraud, it does not follow that the absence of financial loss or financial gains is irrelevant to the instant case. To the contrary, such evidence is relevant to numerous arguments Daniel Kaplan may need to advance at trial in order to present a complete defense. For example, at trial, the government plans to argue that the Kaplans charged their clients exorbitant advisory fees that were "fraudulently inflated." *See* ECF No. 198 at 3–4. To rebut this claim, Daniel Kaplan should be permitted to introduce evidence concerning the success of his advisory services as shown by his clients' financial gains. In this example, the evidence of his clients' financial gains (or lack of financial losses) would not be offered as prior good act evidence or in support of any improper argument (*i.e.*, no harm, no foul). Instead, the evidence would be offered to rebut directly a central claim advanced in the government's case-in-chief—that Daniel Kaplan did not earn the fees he charged. The government does not cite a single case to support its argument that evidence concerning financial losses or gains is never relevant in a wire fraud case because the government does not need to prove loss—nor can it. Where, as here, the government alleges that

8

a defendant took money he was not entitled to and that depended on the management and performance of his clients' investments, the fact that such investments performed well is relevant to counter the government's claim that the alleged victims were unwilling to pay the fees they were charged. Because there are permissible grounds upon which Daniel Kaplan may seek to introduce such evidence, the Court should not preemptively preclude him from doing so.

## VI.    THE COURT SHOULD REJECT THE GOVERNMENT'S MOTION REGARDING THE DEFENSE'S IMPEACHMENT OF ITS WITNESSES.

The government moves to preclude the defense from impeaching its witnesses using FBI notes and memoranda of witness interviews. *See* Mot. at 20. The government's motion is confusing as it is unclear whether it is: (1) simply an uncontroversial request that the defense follow the rules of evidence (and thus entirely unnecessary), or (2) an attempt to narrow improperly the defense's cross-examinations. If the government aims only to preclude the defense from introducing as an *exhibit* or publishing to the jury an agent's notes or report of a witness interview through the witness's (rather than the agent's) testimony as the witness's prior inconsistent statement under Fed. R. Evid. 613, the motion is unnecessary. The non-agent witness likely could not adequately lay foundation for the admission of the agent's notes— indeed, the government proffers that none of the testifying witnesses have "reviewed or adopted" the agent's notes. *Id.* The defense has no intention of attempting to admit such notes or memoranda through any non-agent witness. To the extent the government seeks a broader ruling restricting the scope of cross-examination of any government witness concerning the witness's alleged prior statements (or omissions) to the government, however, the defense objects.

The government's papers are unclear, but the government seems to ask the Court to bar the defense from referring to, reading from, or showing the witness an agent's notes or report other than to attempt to refresh the witness's recollection. *Id.* at 21. The government suggests

9

the defense may ask only whether the witness made a particular statement (potentially without referencing the statement's memorialization in an agent's notes or report—that's unclear, too), and, if the witness denies making the statement, that the defense complete the impeachment by calling a government agent to testify concerning the witness's prior statement. *Id.* at 20–21. That procedure skips a step contemplated by Federal Rule of Evidence 613.

Rule 613 precludes the admission of extrinsic evidence of a witness's prior inconsistent statement (through that witness or any other) "until after the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it." Fed. R. Evid. 613(b). In other words, on its face, Rule 613(b) requires the defense to describe the witness's alleged prior inconsistent statement to the witness so that the witness may "explain or deny" it. While no longer strictly required, impeachment through cross-examination often includes establishing where, when, to whom, and what the witness previously allegedly said. *See United States v. Williamson*, 516 F.2d 390, 392 (2d Cir. 1975) (noting that "fairness usually does require that the witness shall be told when and where he made the putatively contradictory statement") (cleaned up). The government cites no basis to depart from the normal procedures contemplated by the Rule.

The government cites two cases that stand for the uncontroversial proposition that a document that was not written nor adopted by a testifying witness and that does not reflect the testifying witness's prior statements (as opposed to the author's personal impressions) cannot be introduced as an exhibit during cross-examination as the witness's prior inconsistent statement under Rule 613. *See, e.g.*, *United States v. Almonte*, 956 F.2d 27, 30 (2d Cir. 1992) (affirming court's exclusion of AUSA's shorthand summary of witness debrief after a hearing, outside presence of jury, establishing from the AUSA's testimony his notes were consistent with

10

witness's testimony and reflected his own impressions only); *United States v. Leonardi*, 623 F.2d 746, 756–57 (2d Cir. 1980) (finding no abuse of discretion where trial court excluded admission of agent's notes of witness interview through cross-examination of witness).  But neither case addresses the scope of permissible questioning of government witnesses concerning their prior statements to a government agent (as summarized in the agent's notes), as opposed to the admissibility of the agent's notes themselves.  To the extent the government is arguing that the defense should not be permitted to impeach the witnesses at all based on their prior statements to the government, which were memorialized in the agents' notes and memoranda, that would be a stark departure from normal practice and an impermissible infringement on Daniel Kaplan's right to confront the government's witnesses.

The defense fully intends to impeach government witnesses properly, as necessary, in compliance with the Federal Rules of Evidence.  The Court should deny the government's motion as unnecessary, premature, and, as an improper effort to infringe upon the defense's wide latitude to cross-examine government witnesses.

## VII.  THE GOVERNMENT SHOULD NOT BE PERMITTED TO ELICIT SUBJECTIVE TESTIMONY REGARDING MATERIALITY.

The government moves to admit testimony from witnesses as to "whether certain information provided by the Kaplans was important to their investment decisions, and the type of information that they normally consider when making investments."  Mot. at 22.  But the government fails to identify the witnesses from whom it would elicit such testimony or the substance of the testimony it would elicit—that is, what kind of representations the Kaplans allegedly made, or failed to make, to witnesses that were material.  *Id.* at 21.  Because the government does not allege deceit by omission, it is unclear to the defense what statement the government will ask would have made a difference to the alleged victims' investment decisions,

11

had it been disclosed.  Until the government makes a further proffer concerning the evidence it intends to elicit, the Court should deny the government's motion as vague and premature.

Neither the government's description of the testimony nor the Superseding Indictment, ECF No. 149, sheds light on the testimony it seeks to elicit at trial.  The Superseding Indictment alleges that the Kaplans engaged in several fraudulent schemes by (1) "caus[ing] the Advisory Victims to be fraudulently overbilled for advisory fees" (the so-called "overbilling scheme"), (2) "misappropriat[ing] over $4 million from the Advisory Victims for their personal benefit," (the so-called "misappropriation scheme"), and (3) "creat[ing] false documents and ma[king] material misrepresentations to the Advisory Victims to conceal their misappropriation" (the so-called "concealment scheme").  *Id.* ¶ 16.  In connection with the alleged overbilling scheme, the Superseding Indictment alleges that the Kaplans told victims they would charge them a particular percentage and then charged them more than the agreed upon amount.  *Id.* ¶¶ 17–18.  With respect to the "misappropriation scheme," the government alleges that Adam and Daniel requested and obtained direct access to certain clients' accounts to invest clients' funds but then misappropriated client funds instead and made false representations to clients as to why they did so.  *Id.* ¶¶ 19–22.  As to the "concealment scheme," the government claims the Adam and Daniel made affirmative misrepresentations not to clients, but to those clients' financial institutions, by submitting fraudulent documents.  *Id.* ¶ 23.  The Superseding Indictment thus alleges that Adam and Daniel made various unspecified misrepresentations to their clients.

There may be appropriate questions the government could ask certain witnesses to establish that alleged fraudulent misrepresentations or omissions by the Kaplans were material, but without more information, it is impossible to know whether the questions the government intends to ask fit the bill.  And, based on the broad alleged prior bad acts the government seeks to

admit at trial, including the Kaplans' alleged employment separations and alleged dishonesty concerning their undergraduate education, it is not difficult to imagine improper questions the government might seek to ask alleged victims. For example, it would be misleading to ask alleged victims whether they might have refrained from investing with the Kaplans if the Kaplans had disclosed, as the government claims, the circumstances surrounding their separations from their prior employers. That question would be objectionable because a financial advisor has no affirmative duty to disclose prior separations to prospective clients, which are publicly available on a financial advisor's U5 form, and an advisor's omission of such information cannot, on its own, be actionable as fraud, absent a duty to disclose it. *See, e.g.*, *United States v. Litvak* ("*Litvak II*"), 889 F.3d 56, 64 (2d Cir. 2018) (noting in securities fraud cases, a material omission is only actionable where a defendant has "a duty to speak").

The cases the government cites caution against permitting it to introduce investors' personal views concerning whether certain representations or omissions are material without establishing "a nexus between a particular trader's viewpoint and that of the mainstream thinking of investors in that market." *Litvak II*, 889 F.3d at 65. The government cites *Litvak I* for the proposition that it may "permissibly establish what a reasonable investor would consider material through testimony by victims regarding what they considered important." Mot. at 21 (citing *United States v. Litvak* ("*Litvak I*"), 808 F.3d 160 (2d Cir. 2015)). But in *Litvak I*, the Second Circuit reversed Litvak's securities fraud conviction based on the trial court's exclusion of proposed expert testimony that would have addressed, among other things, whether the individual investor's testimony about what they personally considered material was representative of what a "reasonable investor" would consider material. *Litvak I*, 808 F.3d at 182–84. As the Second Circuit further explained in *Litvak II*, it may be permissible for the

13

government to present testimony from investors concerning whether they considered the

defendant's representations material

> only so long as the testimony about the significance of the content of a defendant's misstatements and each trader's "own point of view" is shown to be within the parameters of the thinking of reasonable investors in the particular market at issue. In other words, there must be evidence of a nexus between a particular trader's viewpoint and that of the mainstream thinking of investors in that market. Materiality cannot be proven by the mistaken beliefs of the worst informed trader in a market.

*Litvak II*, 889 F.3d at 65. If the cases the government cites prove anything, they demonstrate

how important it is for the government to meaningfully disclose (with actual detail) the

testimony it proposes to elicit from individual investors to ensure their testimony reflects "the

mainstream thinking of investors in that market." *Id.* The government has not done so here.[4]

Accordingly, its motion to admit witness testimony regarding materiality is premature.

---

[4]      The 3500 material suggests that the government may intend to elicit the witnesses' personal view as to whether, in retrospect, they would have agreed to invest with the Kaplans had they known the Kaplans would ultimately charge a particular percentage in advisory fees. *See, e.g.*, GX-3500-█-6 (" █████ never agreed to a 3% fee. She never would have signed up with him if the fee was going to be 3%"); GX-3500-█-4 ("They asked [████████] what fee he wanted to pay, and he said .7% to which they agreed. That is why he invested with them."); GX-3500-█-2 (" █████ would not have agreed to a fee over 1%. If he had to pay a fee over 1% he would have managed the accounts himself. █████ would not have used the KAPLANS if their fee was over 1%."). If this is the kind of testimony the government intends to elicit, the Court should not allow it unless the government establishes that the percentage fee the investor was charged exceeds the amount that a "reasonable investor" in the relevant market would pay. "In other words, there must be evidence of a nexus between a particular [investor]'s viewpoint and that of the mainstream thinking of investors in that market" before the government can introduce such testimony. *Litvak II*, 889 F.3d at 65.

## VIII. THE COURT SHOULD DENY THE GOVERNMENT'S MOTION TO AUTHENTICATE AND ADMIT DOCUMENTS BECAUSE IT IS VAGUE, OVERBROAD, AND IMPINGES UPON THE KAPLANS' ATTORNEY-CLIENT PRIVILEGE WITH FORMER COUNSEL.

### A. The government's motion to authenticate documents without witness testimony is vague and overbroad.

The government seeks a ruling that any documents "(1) produced by third-party institutions" and "(2) produced by the defendants themselves, both to the SEC and to EDNY" "can be authenticated and admitted" subject only to "certain Rule 403 and hearsay objections."[5] Mot. at 22. The government does not identify the actual third-party institutions, let alone the specific documents, it intends to admit. And the documents at issue are not self-evident. The government has produced, thus far, documents from at least 64 third-party institutions, in multiple tranches. Most of those productions do not include a copy of the subpoena, which would indicate what the production is meant to be responsive to and what the documents contained therein purport to be. Many of the largest third-party productions, moreover, also lack a certification from a records custodian. Thus, as to these productions, the defense is not in a position to confirm that the documents are authentic.[6]

The Court and defense counsel face additional challenges with identifying the particular documents "produced by the defendants themselves" that the government seeks to admit. As the Court and the government know, Todd Blanche, then a partner at Cadwalader, Wickersham, and

---

[5]    The government assumes all the unidentified documents it asks the Court to authenticate and admit need only overcome objections under Federal Rules of Evidence 403 and 802. But the documents, even if authenticated, may be inadmissible for other reasons. For example, they may be irrelevant, they may contain materials prepared for plea negotiations, and so forth.

[6]    The government faults the defense for declining to enter stipulations as to authenticity, *see* Mot. at 22, but the government has ignored repeated requests from the defense to identify by Bates number which documents the government actually seeks to authenticate by stipulation.

Taft LLP ("Cadwalader") and now the United States Deputy Attorney General ("DAG"), not the Kaplans, made document productions to the government.  Current counsel does not have a clear record of (1) all the documents produced by Cadwalader to the U.S. Attorney's Office and (2) how Cadwalader described those documents (*i.e.*, what those documents were purported to be), which makes it impossible to stipulate to the authenticity or admissibility of all such records.

With respect to the productions to the SEC, in response to February 14, 2022 subpoenas from the SEC (the "SEC Subpoenas"), ECF No. 88-1, Todd Blanche made eight productions from March to October 2022 consisting of 59,941 pages of documents.[7]  *See* Michael Tremonte's Declaration in Support of Daniel Kaplan's Opposition to the Government's Motions *in Limine* ("Tremonte Decl."), **Exhibit ("Ex.") I**.  Many of the production letters from Blanche to the SEC provide little to no description of the documents contained in each production.  *See, e.g.*, **Tremonte Decl., Ex. I** (describing production only by Bates numbers).  Based on the descriptions of the productions in the letters from Blanche to the SEC, the nearly sixty-thousand pages of documents produced include, among other things: (1) "a copy of [Blanche's] June 28, 2022 presentation to the Commission," *id.*, **Ex. E**, (2) documents created by Blanche to aid the SEC's investigation, like "lists of financial accounts for Adam and Daniel," *id.*, (3) copies of filings from other litigations, including the FINRA litigation, *id.*, (4) AI-created transcripts of Kaplan client voicemails, *id.*, **Ex. D**, (5) unspecified documents connected to Blanche's targeted review of materials relating to particular Kaplan clients, including people who are not mentioned in the Indictment, the SEC Complaint, or on the government's witness list, *see*, *e.g.*, *id.*, **Ex. C**, (6) emails received or sent by the Kaplans, *see id.*, **Ex. B**, (7) financial account statements,

---

[7]    The SEC issued two subpoenas—one as to Adam Kaplan and one as to Daniel Kaplan. Because they were otherwise identical, we refer to the SEC Subpoenas collectively here.

including statements from accounts "held for the benefit of Adam and Daniel," *id.*, and (8) written responses to the SEC's discovery requests, *id.* Thus, even from the barebones descriptions in the production letters, it is clear the productions include many documents that were not necessarily reviewed or approved for production by the Kaplans.

With respect to productions made directly to the U.S. Attorney's Office, the government has produced only one cover letter indicating that Blanche made a production to the U.S. Attorney's Office for the Eastern District of New York on August 29, 2022 (the "Letter to EDNY"). *Id.*, **Ex. A.** The August 29, 2022 production contained "a copy of all documents produced to the U.S. Securities and Exchange Commission (the 'SEC'), in connection with the SEC's February 14, 2022 subpoena served on the Kaplans." *Id.* Based on the Bates range listed in the Letter to EDNY, Cadwalader made a production of 27,251 pages of documents to the government (together, with the SEC productions, the "Blanche Productions"). The Letter to EDNY offers no further description of the production, but references an August 5, 2022 meeting between Blanche and the U.S. Attorney's Office. The defense is unaware of the representations Blanche made, if any, concerning the method of collection and review and the nature and scope of the production at that meeting.[8] It is also unclear from the face of the Letter to EDNY whether the production included documents created for the purpose of settling the SEC investigation, some of which were expressly referenced in the production letters to the SEC. Furthermore, given that the SEC investigation continued long after August 29, 2022 and subsequent SEC productions, it is unclear whether Blanche made further productions to the government and, if so, what those productions contained.

---

[8]    For reasons that are not clear to the undersigned, Blanche attended the meeting alone and took no notes of his discussions with the prosecutors.

The Court should deny the government's motion to authenticate and admit unidentified documents, produced by unnamed entities, on unspecified dates, in an unknown quantity, containing unknown content.  Daniel Kaplan may not object to the authentication and admission of particular records by certification if the records are otherwise admissible and the certification complies with Federal Rules of Evidence 902(11) or (13) and 803(6).  However, as the government and Court know, not all certifications meet the requirements of the Federal Rules of Evidence.  *See, e.g.*, *United States v. M/Y Amadea*, 770 F. Supp. 3d 558, 604 n.25 (S.D.N.Y. 2025) (excluding documents because the proffered business record certifications did not "lay a proper foundation for bulk admission of these documents as business records. There is no adequate explanation, for example, on a category-by-category basis, of 'how the record[s] came into existence in the course of a regularly conducted activity of the entity.'"); *Penn. St. Univ. v. Vintage Brand, LLC*, 755 F. Supp. 3d 563, 576–77 (M.D. Pa. 2024) (excluding records where affidavit failed to establish sufficiently that the proffered records were the accurate result of a reliable process).  And even where a certification complies with the Federal Rules of Evidence on its face, other circumstances may call into question the veracity of the certification—the facts and details matter, but the government offers none.

In accordance with the notice requirement under Fed. R. Evid. 902(11), the government states that "defendants are hereby informed of the government's intention to offer [the records] as evidence at trial."  Mot. at 26.  Respectfully, that notice is insufficient because it tells Mr. Kaplan precisely nothing.  Mr. Kaplan cannot predict which of the nearly one and half million pages of documents and electronic records produced in this case the government intends to admit through certifications rather than live witness testimony.  Given the government's claim that it has "provided the defendants, and will continue to provide as they become available, the

18

certifications and underlying records in discovery," the government should be able to provide a Bates range to Daniel Kaplan and the Court identifying the records it plans to offer and the accompanying certification. *Id.* To admit the documents at trial, the government must identify them on an exhibit list and provide hard copies of the documents to the Court by September 18, 2025. If the government wants the Court to make a pre-trial decision about whether particular documents can be authenticated and admitted before the Court has received and reviewed the government's exhibits, then the government can and should share the proposed exhibits with the Court and defense counsel now. Until and unless the government does so, the Court should deny the government's motion as vague and premature.

> **B. The government's motion to authenticate and admit documents "produced by the Kaplans" through testimony from their former criminal defense counsel impinges upon the Kaplans' Fifth Amendment rights and the attorney-client privilege.**

The Court should also reject the government's highly unusual request to authenticate an enormous swath of documents through the compelled testimony of the Kaplans' counsel in this case and the parallel SEC proceedings (which this Court has stayed) for numerous reasons. First, such testimony would necessarily violate the Kaplans' Fifth Amendment right not to "contribute to their own prosecution." *In re Grand Jury Subpoena Dated Feb. 2, 2012*, 741 F.3d 339, 344 (2d Cir. 2013). Second, testimony from the Kaplans' former counsel would impinge upon the Kaplans' attorney-client privilege with their former counsel. Third, the testimony would lead to the admission of evidence concerning the SEC proceedings, which the Court should exclude. Fourth, some of the documents themselves may be privileged and inadmissible. And fifth, the proposed testimony would be minimally probative, but highly prejudicial.

The government treats its radical proposal as a ministerial procedural matter. It proposes simply to "call an individual from the defendants' prior firm to testify that they delivered the

records," ignoring the Pandora's box its proposal would open.  *Id.* at 24.  The government gives one of the obvious obstacles—attorney-client privilege—the back of the hand, stating only "[t]here is of course, no privilege at issue considering the defendants' counsel told the government that they had produced these documents to the SEC and would be reproducing them to the EDNY." *Id.* at 24.

        1.    <u>The proposed testimony introduces unnecessary Fifth Amendment concerns.</u>

The government's unorthodox proposal to call a Cadwalader witness to admit the responses to the SEC Subpoenas introduces Fifth Amendment issues that will complicate that witness's testimony—and the trial—unnecessarily.  The SEC Subpoenas threatened the Kaplans' Fifth Amendment rights for many of the same reasons the Court addressed in 2024 when the government attempted to subpoena privileged documents from Cadwalader directly.  *See* ECF Nos. 88–90.  The Court rejected the government's effort to obtain those documents and a records certification from Cadwalader by subpoena; and it should now reject the government's attempt to end-run around the Court's ruling.

Because producing documents "tacitly concedes the existence of the papers demanded" as well as the respondent's "belief that the papers are those described in the subpoena," responding to the SEC Subpoenas threatened an act of production that could communicate incriminatory statements in violation of the Fifth Amendment.  *Fisher v. United States*, 425 U.S. 391, 410–11 (1976); *see also In re Grand Jury Subpoena Duces Tecum Dated May 9, 1990*, 741 F. Supp. 1059, 1068 (S.D.N.Y. 1990) ("[T]he compelled production of one's personal papers is testimonial to the extent that those papers are no more than an extension of one's thoughts.").  That is particularly so because the SEC Subpoenas required Daniel Kaplan to "make extensive use of the contents of his own mind in identifying the hundreds of documents responsive to the

requests in the subpoena," such that he might contribute to a "link in the chain" of the government's prosecution, in further violation of the Fifth Amendment privilege. *United States v. Hubbell*, 530 U.S. 27, 42–43 (2000) (internal quotations and citations omitted). Just like the government's June 2024 subpoena to Cadwalader, for example, the SEC Subpoenas sought, among other things, "all communications . . . with any current or former clients of Adam and/or Daniel" and "a list of all current and former clients of Adam and/or Daniel." *Compare* ECF No. 88-1, *with* ECF No. 88-2 (June 2024 subpoena: seeking "[a]ny and all communications . . . related to the communications between Adam and Daniel Kaplan . . . and any clients of the Kaplans"). Responding to such a request, as this Court noted in quashing the June 2024 subpoena, poses an insurmountable act of production issue.[9] *See* Oct. 10, 2024 Hrg. Tr. at 18 (Court: "My biggest issue with this subpoena in this case concerns this [act of] production issue. . . . The first request concerning client communications in my view seems problematic" and "raises related issues concerning both the [act of] production doctrine and attorney-client privilege."); *see also In re Katz*, 623 F.2d 122, 125–26 (2d Cir. 1980) (compelled surrender by an attorney of documents relating to "any company owned, operated or controlled" by his client, where the client's "interest in or relation to the document" was confidentially divulged, "per se may constitute a testimonial communication that tends to incriminate him").

---

[9]    While the foregone conclusion exception may apply to some number of the nearly sixty-thousand pages of documents Blanche produced, it almost certainly did not apply to the entirety of his Productions—including, in particular, communications regarding any Kaplan "clients"—for the same reasons the Court stated last October. *See* Oct. 10, 2024 Hrg. Tr. at 19 (Court: "I would also say this lack of specificity concerning the identity of the relevant clients also concerns me with respect to the financial institutions because I think the lack of specificity . . . makes it difficult for you to satisfy the foregone conclusion requirement. The way the subpoena is worded in my view does not satisfy the foregone conclusion requirement concerning client communications because you haven't identified the clients.").

The striking Fifth Amendment concerns surrounding the Blanche Productions—and Blanche's apparent (and inexplicable) failure to raise them[10]—are further exacerbated by the fact that Blanche now helps lead the Department prosecuting his former clients and is adverse to them in active civil litigation related to his conduct as their attorney during the SEC and DOJ investigations. *See Adam Kaplan and Daniel Kaplan v. Cadwalader Wickersham & Taft, LLP and Todd Blanche*, Index No. 609236/2023, NYSCEF No. 1 (Sup. Ct. Nassau Cnty. June 12, 2023). In his current role, Blanche has access to, and may be involved with decisions regarding, all federal criminal prosecutions. And while any involvement of Blanche would constitute a clear conflict of interest and breach of his ethical obligations, the government has, to date, been silent as to whether or how Blanche has been recused and walled off from this prosecution. *See* N.Y. Rules of Pro. Conduct r. 1.11(d)(2)(i); U.S. Dep't of Just., Just. Manual § 1-4.010.

Given the Fifth Amendment problems with the Blanche Productions, and the ambiguity surrounding whether or how those constitutional concerns were raised, permitting a Cadwalader witness to testify against the firm's former clients introduces a substantial risk to Daniel Kaplan's constitutional rights. Such testimony, moreover, would open the door, in the spirit of completeness, to a host of issues regarding the distinct history of the Kaplans' relationship with Cadwalader, Blanche, and Blanche's Productions that would create undue distraction and delay at trial.

---

[10]    To the extent Blanche objected to the SEC Subpoenas based on these or similar Fifth Amendment concerns during his communications with the SEC, we reiterate and preserve those objections. *See Emspak v. United States*, 349 U.S. 190, 198 (1955) ("[C]ourts must indulge every reasonable presumption against waiver of fundamental constitutional rights." (internal quotation marks omitted)).

2.    The proposed testimony would violate the Kaplans' attorney-client privilege.

The government's radical proposal fails on its face for the independent reason that it cannot authenticate the Blanche Productions as "documents produced by the Kaplans" without invading the attorney-client privilege.  The government correctly states that to authenticate a document under Federal Rule of Evidence 901(a), the proponent must establish that the document is "what the proponent claims it is."  If the government sought only to establish that the Productions are a collection of documents produced by Cadwalader to the government *during the course of their representation of the Kaplans*, and nothing more, then the government's proposed testimony from a Cadwalader attorney could suffice.  Although the government still has not provided any 3500 as to the Cadwalader witness—despite repeated requests, *see, e.g.*, ECF Nos. 233, 246—its motions *in limine* make clear the government aims to do far more.

Instead, the government intends to establish that the Blanche Productions *are Adam and Daniel's documents*—documents they saw, controlled, approved of, or reviewed.  The government can only do so by eliciting testimony from the Kaplans' attorney that depends on privileged communications.  To establish Adam and/or Daniel's connection to the documents would require the attorney to testify, directly or indirectly, to what Adam and/or Daniel told the attorney in confidence regarding their access to and understanding of the documents.[11]  That information is squarely protected by attorney-client privilege and its disclosure cannot be

---

[11]    Any attempt to authenticate specific documents as belonging to Adam Kaplan or Daniel Kaplan individually faces the same problem:  to establish that evidentiary chain, the Cadwalader witness would necessarily have to divulge protected communications.  Such testimony, moreover, would present an additional layer of complexity given Cadwalader's joint representation of the Kaplans.  To the extent that testimony relied on one Kaplan's statement as to whether or which documents belonged to the other, it would introduce issues as to the witness's certainty as to whether, in fact, he was speaking to Adam or Daniel Kaplan, which would result in delay and confusion.

compelled.  *See United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989) ("The attorney-client privilege generally forbids an attorney from disclosing confidential communications that pass in the course of professional employment from client to lawyer."); *id.* at 244 (noting the privilege applies "regardless of the manner in which it is sought to put the communications in evidence, whether by direct examination, cross-examination, or *indirectly as by bringing out facts brought to knowledge solely by reason of a confidential communication*" (emphasis in original)).

Though the government breezily addresses the potential privilege issues as merely an evidentiary matter, the attorney-client privilege has constitutional dimensions.  "Without the attorney-client privilege, that right and many other rights belonging to those accused of crime would in large part be rendered meaningless."  *Id.* at 243; § 5472 Policy of the Privilege, 24 Fed. Prac. & Proc. Evid. § 5472 (1st ed.) ("at least so far as the criminal defendant is concerned, the attorney-client privilege is a necessary concomitant of his Fifth Amendment right not to incriminate himself and his Sixth Amendment right to the assistance of counsel").  Accordingly, the Federal Rules of Evidence do not require a witness to disclose material that is privileged under Rule 501, and the rules of professional conduct expressly prohibit defense counsel from disclosing privileged communications, *see* N.Y. Rule of Prof. Resp. 1.6, comment 13.

Even the United States Department of Justice Manual expressly recognizes the potential threat to the attorney-client privilege posed by the government's use of its subpoena power to compel a defendant's lawyer to testify.  The Justice Manual provides specific guidelines for a prosecutor's issuance of a grand jury or trial subpoena to a defendant's attorney:

> Such subpoenas (for both criminal and civil matters) must first be authorized by the Assistant Attorney General or a Deputy Assistant Attorney General for the Criminal Division before they may

24

issue, *unless* the circumstances warrant application of one of the exceptions set forth in subsection D below.

U.S. Dep't of Just., Just. Manual § 9-13.410.  None of the exceptions in subsection D applies. Here, the Justice Manual's approval requirements would provide cold comfort to the Kaplans. Such approval, after all, would come from one of the direct reports to Todd Blanche—Adam and Daniel's former principal attorney at Cadwalader, and now a leader of the Department prosecuting them.  Because of the unacceptable risk to the Kaplans' attorney-client privilege posed by presenting a Cadwalader witness's testimony, the Court should deny the motion.

> 3.  The proposed testimony would require the admission of prejudicial hearsay evidence concerning the SEC Action.

If the Court permits a Cadwalader witness to testify that Cadwalader made Productions to the SEC and the prosecution, the Court will necessarily admit evidence of the existence, and even the particulars, of the SEC Action.  For the reasons stated *supra* Section I and in Adam Kaplan's opposition, such testimony should be excluded.

> 4.  The proposed testimony, even if properly limited, would be substantially more prejudicial than probative under Fed. R. Evid. 403.

If a witness from Cadwalader testifies only that Cadwalader delivered the Blanche Productions to the government while representing the Kaplans, and nothing further, such testimony has marginal probative value but is highly prejudicial.  That testimony would only explain that at some point Cadwalader had access to the documents—but nothing about their provenance—and that Cadwalader identified the documents as responsive to the SEC Subpoenas based on its subjective impressions of them.  Such testimony, however, would not elucidate the Kaplans' relationship to or familiarity with the Blanche Productions, which is the only thing that could make their contents relevant to any disputed fact in the first place.

25

At the same time, testimony from a Cadwalader witness poses a substantial risk of prejudice. Because the Blanche Productions were made in 2022, years before the Superseding Indictment, testimony about them would invite the jury to draw unjustified inferences about the thoroughness of the government's investigation and the strength of its case. It would also encourage improper speculation as to the reasons for the breadth of the Blanche Productions, and why Adam and Daniel Kaplan are now separately represented. Worst of all, however, the very presence of Adam and Daniel's former criminal defense attorney as a *government* witness will improperly signal to the jury that Cadwalader, itself, has concluded Adam and Daniel did something wrong. Because even limited testimony about *the fact* of the Blanche Productions risks undue prejudice—beyond the prejudice posed by the documents' contents—and because it promises negligible probative value, the government's motion should be denied.

### C.    The documents the government seeks to authenticate and admit may be protected by privilege.

The Court should additionally reject the government's motion to wholesale introduce the Blanche Productions because some of the documents contained therein may be privileged. The Blanche Productions may contain documents that were privileged under Federal Rules of Evidence 408 and 410, including documents pertaining to settlement negotiations and outcomes in separate civil proceedings, and under the attorney-client privilege, the common interest privilege, and the attorney work product doctrine. If the Blanche Productions inadvertently disclosed any privileged documents, those documents may still be protected by privilege and should not be admitted at trial.

Blanche warned in each production cover letter that his production "is not intended to be, and should not be considered, a waiver of any privilege or other protection that could be asserted by Adam and/or Daniel Kaplan," that the Kaplans reserved all applicable privileges, and if the

"production includes information that is protected by any privilege, such production is inadvertent and should not be considered a waiver." *See, e.g.*, **Tremonte Decl., Ex. B**. Blanche also requested confidential treatment of the entire production under various applicable statutes and regulations and copied the SEC's Office of FOIA Services on his letter. *Id.* Given the breadth of the Productions, the absence of a privilege log, and the lack of specific descriptions of in the production cover letters, it is probable that Blanche produced privileged material. *See United States v. Gangi*, 1 F. Supp. 2d 256, 264 (S.D.N.Y. 1998) (acknowledging that "mistakes will be made given the realities of the discovery process in complex litigation") (internal citation omitted). If any privileged documents were inadvertently produced, the privilege attached to those documents was not automatically waived. Courts in this Circuit use a "flexible approach" to waiver and do not construe inadvertent production as waiver "unless the conduct of the producing party or its counsel evinced such extreme carelessness as to suggest that it was not concerned with the protection of the asserted privilege." *Id.*

Without *any* guidance as to which documents the government seeks to admit, neither the defense nor the Court can be confident that the government's motion avoids introducing privileged materials that were inadvertently produced in the Blanche Productions.

## IX. THE DEFENSE SHOULD NOT BE ORDERED TO PROVIDE DISCOVERY BEYOND ITS OBLIGATIONS UNDER THE FEDERAL RULES, WITH WHICH IT WILL COMPLY.

The government asks the Court to (1) set an August 29, 2025 deadline for the defense's production of Rule 16 materials, which the government argues should include not only material the defense intends to use in its case-in-chief, but also material the defense may seek to admit through cross-examination, (2) set an unspecified deadline for the disclosure of any defense witnesses, and (3) require the parties to exchange demonstratives to be used during opening statements by August 29, 2025. Mot. at 29–30. The Court should deny these requests.

*First*, as is common at this stage of proceedings, the defense cannot yet determine whether it will present an affirmative case at all, and, which materials it may seek to introduce as exhibits, if any.  Rule 16(b) reflects that the defense only decides whether to put on an affirmative case shortly before or even during trial by directing courts to set a deadline for the defense's *expert* disclosure—a decision the defense typically makes before trial because it involves identifying and retaining an expert witness.  The Rule, however, contains no similar requirement for the defense's disclosure of *non-expert* materials.  The defense is working diligently to identify any discoverable material to produce pursuant to Rule 16(b).  This process is ongoing, however, in part due to the government's continuing Rule 16(a) and 3500 productions, ongoing third-party subpoena responses, and the defense's review of those materials.  For example, this past week, the defense received a production of more than 12,000 pages of documents from the government relating to several key government witnesses.  The government's proposed August 29, 2025 deadline for the production of Rule 16(b) materials, four days from now, is both unnecessary and unrealistic.[12]

*Second*, the Court should decline the government's invitation to extend the requirements of Rule 16(b) beyond its plain language.  Rule 16(b)(1)(A) only requires the disclosure of items "within the defendant's possession, custody, or control" that the defense "intends to use . . . in the defendant's case-in-chief at trial."  The government acknowledges, as it must, that Rule 16(b) does not require the defense to disclose documents it intends to use during cross-examination for

---

[12]      Should the Court decide to set a deadline for the disclosure of Rule 16(b) materials, the defense proposes September 18, 2025, the deadline for the parties to provide their exhibits to the Court.  *See* Aug. 21, 2025 Scheduling Order.  This proposed deadline would enable the government to make any objections before the start of trial on September 22, 2025, and aligns with this Court's recent practices.  *See United States v. Johnson*, No. 20-CR-518 (JMA), 2025 WL 1181706, at *4 (E.D.N.Y. Apr. 23, 2025) (Azrack, J.) (setting disclosure deadline of May 1, 2025 for trial scheduled to begin on May 5).

impeachment. Mot. at 27. But the government asks the Court to require the defense to identify and produce to the government any documents the defense may wish to admit during cross-examination, including documents the government already has in its possession (and itself produced to the defense), if such exhibits "affirmatively support the defendant's theory of the case." *Id.* The government's interpretation of the defense's obligations under Rule 16(b) sweeps more broadly than the language of the rule, which requires disclosure only of items the defense intends to use during its own case-in-chief.

The government's reading of the rule is also too vague for a defendant to reasonably comply with it. For instance, where a defendant does not raise an affirmative defense, does not plan to put on a case-in-chief, and intends only to introduce documents on cross-examination to generally undermine the witness's credibility (versus showing the witness a document to refresh their recollection or impeach a specific statement made on direct examination, if needed), is that use of a document "affirmatively support[ing] the defendant's theory of the case"? *Id.* at 27.

The government's argument presents other practical difficulties. Without yet having heard a single government witness's testimony on direct examination (and especially without having received all 3500 material for the government's witnesses), the defense cannot yet know which documents, if any, it may wish to introduce on cross-examination. The government cites no binding authority to support its request from this Circuit or any other.

*Third*, as to the date for disclosure of statements of any defense witnesses, Rule 26.2(a) only requires disclosure after a witness testifies on direct examination, before cross-examination. If the Court is inclined to set a deadline earlier than Rule 26.2 requires, the defense suggests two days before the defense witness is expected to testify is sufficient. *See, e.g. Johnson*, 2025 WL 1181706, at *4; *United States v. Ayers*, No. 20-CR-239 (BMC), 2024 WL 1158686, at *15

29

(E.D.N.Y. Mar. 18, 2024); *United States v. Smothers*, 652 F. Supp. 3d 271, 308 (E.D.N.Y. 2023). The defense will comply with its Rule 26.2 obligations, and the government offers no reason why the Court should accept the government's proffers of compliance with its discovery obligations but impose a more stringent deadline on the defense.

*Fourth*, the government's proposal that the parties mutually exchange demonstratives to be used during opening statements no later than August 29, 2025 (ten days before jury selection is scheduled to commence) is simply impracticable, particularly in light of the ongoing discovery and review described above. Instead, the defense requests the Court order the parties to exchange demonstratives on or before September 19, 2025, so that any objections may be heard the morning of September 22, 2025, prior to opening statements. *See United States v. Aguilar*, No. 20-CR-390 (ENV), ECF No. 238 at 1-2 (E.D.N.Y. Jan. 2, 2024) (ordering exchange of opening demonstratives one-hour after close of jury selection, the night before opening statements). The defense also has no objection to the government's requested ruling that demonstratives used in opening statements do not include any exhibits.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the government's motions *in limine*.

Dated:  New York, New York
    August 25, 2025

                        SHER TREMONTE LLP

                        */s/ Michael Tremonte*
                        Michael Tremonte
                        Noam Biale
                        Alexandra Conlon
                        Claire Blumenthal Buck
                        90 Broad Street, 23rd Floor
                        New York, New York 10004
                        Tel: 212.202.2600
                        Email: mtremonte@shertremonte.com

                        *Attorneys for Daniel Kaplan*